EXHIBIT  A

*EXECUTION VERSION*

## PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (this "Agreement") is entered into as of the 17th day of May, 2021 (the "Effective Date"), by and among the Smith Law Firm, PLLC, a Mississippi professional limited liability company (the "Purchaser"), on the one hand, and Porter & Malouf, P.A., a Mississippi professional association ("Seller"), and each of its shareholders Timothy W. Porter, Esq., a resident of Mississippi ("Porter") and Patrick Cash Malouf, Esq., a resident of Mississippi ("Malouf"), each of Porter and Malouf collectively the "Seller Partners" or individually a "Seller Partner").  The Seller and together with the Seller Partners collectively are the "Seller Parties" or individually a "Seller Party".  The Purchaser and the Seller Parties are sometimes hereinafter referred to collectively as the "Parties" and are each sometimes hereinafter referred to as a "Party".

## RECITALS:

**WHEREAS,** Seller and Seller Partners are party to Fee Agreements, Co-Counsel Agreements and other arrangements pursuant to which Seller and Seller Partners serve as counsel and/or are entitled to an interest for collected fees and rights to any reimbursable expenses (including any Case Expenses) in the cases or claims now or hereafter existing for which Seller and/or Seller Partner has or may have an interest in the Talc Litigation, including those cases or claims listed or referenced on Schedule 4.02(a)(collectively, the "Talc Cases"); and

**WHEREAS,** Seller Parties now desire to sell, assign and transfer all of their respective Transferred Rights to Purchaser, and Purchaser desires to purchase Seller Parties' Transferred Rights therefrom pursuant to the terms and conditions set forth in this Agreement; and

**WHEREAS**, the Seller Partners will substantially benefit as a result of the transactions contemplated by this Agreement and each Seller Partner desires to stand behind the obligations of Seller as set forth in this Agreement.

**NOW, THEREFORE,** for and in consideration of the mutual covenants, agreements, representations and obligations set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

## ARTICLE I
## DEFINED TERMS

1.01    Definitions.  The following terms shall have the following meanings when used in this Agreement:

"Affiliate" or any "affiliate of", or a Person "affiliated with," a specified Person, is a Person that directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified.  The term "control" (including the terms "controlling," "controlled by" and under "common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise and shall include any

partner, shareholder, or principal, or any Person that owns 10% or more of the beneficial ownership of equity interests of the Person.

"Agreement" shall have the meaning assigned to such term in the preamble to this Agreement.

"Applicable Laws" means any treaty, constitution, statute, order, decree, judgment, regulation, rule, ordinance, ruling, charge, or other restriction of any government, governmental agency, or court applicable to any person or entity, including the Mississippi Rules and any other rules of attorney conduct or attorney disciplinary rules and interpretations of any applicable state or jurisdiction, as may be amended from time to time.

"Assumed Liabilities" means (i) the obligation to reimburse Beasley Allen for any ongoing case expenses, common benefit expenses, or other expenses to the extent attributable to the Transferred Rights and billed for the three month period of time beginning April 1, 2021 and ending June 30, 2021 and for each three month period thereafter, as customarily billed by Beasley Allen under the Beasley Allen Co-Counsel Agreement, and required to be reimbursed by any Seller Party or its Affiliates pursuant to the Beasley Allen Co-Counsel Agreement, (ii) the obligation to reimburse Seller for any ongoing case expenses, common benefit expenses, or other expenses to the extent attributable to the Transferred Rights, incurred by Seller or Beasley Allen, and billed for the three month period of time beginning April 1, 2021 and ending June 30, 2021 and for each three month period thereafter, and required to be paid by Seller pursuant to the Beasley Allen Co-Counsel Agreement or the Smith Co-Counsel Agreement, and (iii) all of the Seller Parties' obligations (including the Seller Parties' workload obligations) with respect to the Transferred Rights under the Beasley Allen Co-Counsel Agreement and the Smith Co-Counsel Agreement to the extent attributable to the period after the Closing.

"Bankruptcy Event" means any of the following:

(a)    an involuntary proceeding is commenced or an involuntary petition is filed in a court of competent jurisdiction seeking (i) relief in respect of a Seller Party, or of a substantial part of the property or assets of any Seller Party, under Title 11 of the United States Code, as now constituted or hereafter amended, or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law; (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator, or similar official for any Seller Party or for a substantial part of the property or assets of any Seller Party; or (iii) the winding-up or liquidation of any Seller Party; and such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered; or

(b)    Seller Party (i) voluntarily commences any proceeding or files any petition seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other federal, state, or foreign bankruptcy, insolvency, receivership, or similar law; (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in clause (a) above; (iii) applies for or consents to the appointment of a receiver, trustee, custodian, sequestrator, conservator, or similar official for Seller Party or for a substantial part of the property or assets of Seller Party; (iv) files an answer admitting the material allegations of a petition

2

filed against it in any such proceeding; (v) makes a general assignment for the benefit of creditors; (vi) becomes unable, admits in writing its inability or fails generally to pay its debts as they become due; or (vii) takes any action for the purpose of effecting any of the foregoing.

"Beasley Allen Co-Counsel Agreement" means that certain Letter Agreement dated December 19, 2013 by and among Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., Allen Smith, Patrick Malouf and Tim Porter on behalf of their respective firms, as may be amended, modified, or supplemented from time to time.

"Beasley Allen" means the Beasley Allen Law Firm; Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.; or any successors or predecessors to such firms.

"Books and Records" means, with respect to any Person, all files, documents, instruments, data, information, papers, books and records of such Person's operations, affairs, financial condition, results of operations, prospects, assets or liabilities that in any way relate to or would be useful in the evaluation of the Transferred Rights, including the Fee Agreements, Co-Counsel Agreements, information relating to the Talc Cases and the Intangibles and Intellectual Property.

"Business Day" means any day on which national banks are open for business in Jackson, Mississippi.

"Case Expenses" means any and all reimbursable expenses incurred by the Seller Party or for the account of Seller Party attributable to each of the Talc Cases, including MDL fees and local counsel fees.

"Clients" means any Persons with respect to the Talc Litigation that are past, current or future clients of any Seller Party or any Co-Counsel pursuant to any Fee Agreements or the Co-Counsel Agreements, but shall not include any clients expressly excluded from the Talc Litigation or any Persons that cease to be Clients as provided in Section 5.03(a).

"Closing" shall have the meaning assigned to such term in Section 7.01.

"Closing Date" shall have the meaning assigned to such term in Section 7.01.

"Co-Counsel" means the counterparty to Seller Party under a Co-Counsel Agreement.

"Co-Counsel Agreements", with respect to the Talc Litigation, means any co-counsel agreement, joint representation agreement, joint prosecution agreement, joint venture agreement, referral agreement, affiliation agreements and other  agreements between any Seller Party and various law firms regarding the acquisition and prosecution of Talc Litigation matters, the provision of legal services, and the obligation of Co-Counsel to pay certain of the clients' fees and/or reimbursable expenses to any Seller Party, including the Beasley Allen Co-Counsel Agreement, the Smith Co-Counsel Agreement and any other Co-Counsel Agreements listed on Schedule 4.02(b).

"Effective Date" shall have the meaning assigned to such term in the preamble to this Agreement.

Confidential

"Encumbrance" means any (a) mortgage, pledge, lien, security interest, charge, hypothecation, security agreement, security arrangement or encumbrance, or other adverse claim against title of any kind; (b) purchase, option, call, or put agreement or arrangement; (c) subordination agreement or arrangement; (d) prior sale, transfer, assignment, or participation by any Seller Party of the Transferred Rights, the Proceeds, or any interest in the Talc Litigation; or (e) agreement or arrangement to create or effect any of the foregoing.

"Excluded Cases" means cases or claims for injuries directly or indirectly related to products containing talcum powder in which any Seller Party has been engaged directly or indirectly by (i) the Attorney General of the State of Mississippi to represent Mississippi in claims against Persons that have violated the Mississippi Consumer Protection Act or other applicable laws and injured the citizens of the State of Mississippi, (ii) the attorney general of any other State in the United States or the District of Columbia to represent that State or the District of Columbia in claims against Persons that have violated applicable laws and have injured the citizens of the particular State or District of Columbia, or (iii) any other Governmental Authority to represent that Governmental Authority in claims against Persons that have violated applicable laws and have injured the citizens of the particular Governmental Authority.

"Expense Contributions" means those certain expense contributions made by any Seller Party on behalf of Purchaser in the aggregate amount of ▮▮▮▮▮▮▮▮

"Fee Agreements" means any valid powers of attorney, engagement letters, or client letters executed between any Seller Party or any Co-Counsel of Seller Party and any client in connection with the Talc Litigation, as well as any such future powers of attorney, engagement letters, or client letters, as amended, modified, supplemented or restated from time to time.

"Fundamental Representations and Warranties" means the representations and warranties contained in Section 3.01, Section 3.02, Section 3.04, Section 3.05, Section 4.01, Section 4.04, Section 4.05, Section 4.08, Section 4.09(d), and Section 4.10.

"Governmental Authority" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a State, the United States, or a foreign entity or government.

"Indemnified Party" means the Party making a claim for a Purchaser Loss or Seller Loss, as applicable.

"Indemnifying Party" means the Party against whom a claim for a Purchaser Loss or a Seller Loss, as applicable, is made.

"Intangibles and Intellectual Property" means all intangibles and intellectual property rights used or useful with respect to the Talc Litigation (including the marketing thereof), including all U.S. and foreign (i) patents, patent applications, patent disclosures and all related continuations, divisionals, reissues, re-examinations, substitutions and extensions thereof, (ii) trademarks, services marks, names, tradenames, web sites, marketing materials, domain names,

4

social media accounts, logos, slogans, trade dress and similar designations of source or origin, together with the goodwill symbolized by any of the foregoing, (iii) copyrights and copyrightable subject matter, (iv) proprietary rights in computer programs, databases, algorithms, compilations and other collections of data related to the Talc Litigation, and in all documentation related to any of the foregoing, (v) trade secrets and other confidential information, including ideas, processes, know how, models and methodology relating to the Talc Litigation, and (vi) any and all applications and registrations relating to any of the foregoing. "Intangibles and Intellectual Property" does not include the corporate name or associated rights of the Seller.

"Knowledge" or "knowledge" or any similar knowledge qualification of any Seller Party means the actual or constructive knowledge of Seller or any Seller Partner after due inquiry.

"Loss" or "Losses" shall have the meaning assigned to the term in Section 8.01(a).

"Mississippi Rules" means the rules and regulations governing the practice of law in Mississippi including the Mississippi Rules of Professional Conduct issued by the Supreme Court of Mississippi, any published written opinions of the Ethics Committee of the State Bar of Mississippi interpreting the Rules of Professional Conduct, and any other applicable rules and regulations governing conduct of Mississippi lawyers, all of which as may be amended from time to time.

"Notices" means all notices, requests, demands, claims, and other communications pertaining to this Agreement.

"Party" shall have the meaning assigned to such term in the preamble to this Agreement.

"PDF" means portable document format.

"Person" means any individual, partnership, corporation, limited liability company, limited liability partnership, professional corporation, professional association, association, estate, trust, business trust, Governmental Authority, fund, investment account, or other person or entity.

"Proceeds" means any and all proceeds, receivables, property, cash, and other consideration payable to, or on behalf of, a Seller Party or its Affiliates arising out of the Talc Litigation (whether by suit, judgment, settlement, claims process, or otherwise), including (a) any Seller's Fee Share, (b) any amounts payable pursuant to any Co-Counsel Agreement or other arrangement, (c) any attorneys' fees and costs recovered on or after the Closing Date, (d) any Case Expenses, (e) any consequential, actual, punitive, exemplary, or treble damages on account thereof, and (f) any interest awarded or later accruing on the foregoing.

"Purchase" shall have the meaning assigned to such term in Section 2.02.

"Purchase Price" shall have the meaning assigned to the term in Section 2.04.

"Purchaser" shall have the meaning assigned to such term in the preamble to this Agreement.

"Purchaser Indemnitees" shall have the meaning assigned to such term in Section 8.01(b).

5

Confidential

"Purchaser Losses" shall mean any claim for Losses brought by Purchaser Indemnitees.

"Representative" means Amir Shenaq, Esq. and Shenaq PC, a Georgia professional corporation.

"Retained Liabilities" shall have the meaning assigned to such term in Section 2.03.

"Seller" shall have the meaning assigned to such term in the preamble to this Agreement.

"Seller's Fee Share" means the respective share of the legal fees any Seller Party has a right to arising out of the Talc Litigation, including any fees payable pursuant to any Fee Agreement, the Co-Counsel Agreements or any of the Talc Cases.

"Seller Indemnitees" shall have the meaning assigned to such term in Section 8.01(a).

"Seller Losses" shall mean any claim for Losses brought by Seller Indemnitees.

"Seller Partner" or "Seller Partners" shall have the meaning assigned to such term in the Preamble.

"Seller Party" or "Seller Parties" shall have the meaning set forth in the Preamble.

"Smith Co-Counsel Agreement" means that certain Co-Counsel Agreement between Smith Law Firm PLLC and Porter & Malouf, P.A. (undated).

"Talc Litigation" means (a) any cases, causes of action, or claims, whether in existence or hereafter arising, directly or indirectly related to injury caused by prolonged use of products containing talcum powder in the United States, Canada or otherwise (i) in which a Seller Party directly or indirectly represents a Client through a Fee Agreement or Co-Counsel Agreement or (ii) with respect to which a Seller Party has a right to payment pursuant to a Co-Counsel Agreement or other agreement or arrangement, and (b) any cases, causes of action, or claims arising out of or relating to talcum powder cases in which a Seller Party has an interest, whether now or hereafter existing, including actions whereby Seller Party has been directly or indirectly engaged on behalf of Medicaid secondary payers or other participants in health plans; together with (x) any and all claims, suits, causes of action, proceedings, and other rights relating to, or arising from, such matters, (y) any and all appellate proceedings, proceedings on remand, and enforcement, ancillary, parallel, or alternate dispute resolution proceedings and processes arising out of or related to such matters, and (z) any additional cases, lawsuits, arbitration matters, or other proceedings filed or initiated by or on behalf of Seller Parties based upon the same or substantially similar claims. Talc Litigation shall expressly exclude the Excluded Cases, and shall not include any Client or matters for which the Seller Parties provide services after the termination of the Restricted Period to the extent permitted by Section 5.03(a).

"Transaction Documents" means this Agreement and the other transaction documents entered into in connection with the transactions contemplated by this Agreement.

"Transferred Rights" means (i) all of Seller Parties' rights, title, and interest in and to the Talc Cases and the Talc Litigation and the Proceeds therefrom, whether now or hereafter existing,

Confidential

which shall include all rights, title and interest in all Case Expenses, the Fee Agreements and Co-Counsel Agreements, (ii) all Intangibles and Intellectual Property of any Seller Party, and (iii) all goodwill of Seller Parties attributable to the Talc Litigation.  The Transferred Rights shall not include the right of any Seller Party to the reimbursable expenses associated with the Excluded Cases.

1.02    Interpretation, etc.  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  References herein to any Article, Section, Appendix, Schedule or Exhibit shall be to an Article, Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided.  The use herein of the word "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not no limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  The words "hereof", "herein", "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless the context requires otherwise or as otherwise specified in this Agreement, (a) reference to any Person includes that Person's successors and assignees, (b) any definition of or reference to this Agreement, any other agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements, or modifications set forth herein or therein), and (c) any reference to any law or regulation herein shall refer to such law or regulation as amended, modified or supplemented from time to time.

## ARTICLE II
## PURCHASE OF TRANSFERRED RIGHTS

2.01    Incorporation of Recitals.  The Recitals are incorporated into this Agreement for all purposes.

2.02    Purchase of Transferred Rights.  Subject to the terms and conditions set forth herein, at the Closing, Seller Parties agree to, and at Closing will, sell, convey, transfer, assign and deliver the Transferred Rights to the Purchaser, and the Purchaser agrees to, and at Closing will, purchase the Transferred Rights from Seller Parties, free and clear of any Encumbrances, except those Encumbrances to be satisfied at Closing (the "Purchase").

2.03    Liabilities Assumed.  Subject to the terms and conditions of this Agreement, the Purchaser will assume the Assumed Liabilities, and shall timely pay and perform the Assumed Liabilities including, but not limited to, those required under the Co-Counsel Agreements. Except for the Assumed Liabilities or otherwise expressly provided in this Section 2.03, the Purchaser will not assume any liabilities, obligations or undertakings of any Seller Party of any nature whatsoever, whether fixed or contingent, known or unknown, including any obligations or liabilities arising from the use or operation of the Transferred Rights on or prior to the Closing Date (the "Retained Liabilities").  Following the Closing and upon receipt of written notice from

Confidential

either the Seller Parties or Beasley Allen of any Assumed Liabilities due and owing, Purchaser shall remit all such amounts owed to Beasley Allen as required pursuant to the Beasley Allen Co-Counsel Agreement.  If such Assumed Liabilities are paid by Seller Parties due to the failure of Purchaser to pay such Assumed Liabilities as required pursuant to this Agreement, Purchaser shall promptly reimburse Seller Parties for the amounts paid by Seller Parties or if incurred and paid by the Seller Parties to Beasley Allen, within ten (10) Business Days of receipt of written notice of such payment by Seller Parties.  Such notice from Seller Parties shall contain the amount paid, together with customary supporting documentation with respect to such expenses and obligations.  If Purchaser fails to reimburse Seller Parties as required pursuant to the preceding sentence, Seller Parties shall be entitled to exercise their rights and remedies under Article VIII of this Agreement.  Subject to the terms and conditions of this Agreement, Purchaser acknowledges and agrees that it assumes all risk of non-payment by Beasley Allen for whatever reason under the Beasley Allen Co-Counsel Agreement with respect to the Transferred Rights.  Purchaser has not received notice (either written or oral) from Beasley Allen that Purchaser or any Seller Party is in material default, breach, or non-compliance of the terms of the Beasley Allen Co-Counsel Agreement.  Subject to the terms and conditions of this Agreement, Purchaser acknowledges and agrees that it will assume the workload obligations of Seller Parties under the Beasley Allen Co-Counsel Agreement arising on and after the Closing Date with respect to the Transferred Rights.

2.04    Purchase Price and Payment.  As consideration for the Transferred Rights, subject to the terms and conditions set forth herein, at the Closing, the Purchaser shall pay to the Seller the sum of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (the "Purchase Price").  The Purchase Price shall be distributed to the following Persons: (i) to Seller Parties' lender Counsel Financial of the amount set forth in Schedule 2.04(a), and then the balance (ii) to the Porter & Malouf Talc QSF and the Seller to the accounts pursuant to the wiring instructions as provided by Seller at least two (2) Business Days prior to the Closing.  The payment payable to the Seller as set forth herein shall be paid by the Purchaser in immediately available funds on the Closing Date.

2.05    Acknowledgment of Satisfaction.  Each Seller Party acknowledges that the Purchase Price constitutes complete satisfaction and payment for all capital contributions, goodwill, allocation of earnings, capital accounts, equity interests of any kind, and other any rights or obligations, written or unwritten, express or implied, relating to the Transferred Rights and fully satisfies and discharges any obligations or liabilities of Purchaser or any Affiliates arising out of the period prior to the Closing Date, except for the Assumed Liabilities. Seller Parties acknowledge and agree that the Purchase Price includes the amount of ▓▓▓▓▓▓▓ which represents the satisfaction and payment in full of the Expense Contributions, and the amount of ▓▓▓▓▓▓▓ which represents the reimbursement of Seller's expenses for the Talc Litigation for the fiscal quarter ended March 31, 2021.

2.06    Funds Received Before Closing.  All funds received by any Seller Party attributable to the Transferred Interests received after the date hereof from the settlement or resolution of any of the Transferred Rights prior to or after the Closing Date shall be held in trust by the Seller Parties for the benefit of Purchaser and shall be promptly (but in no event more than two (2) Business Days after receipt) transferred by Seller Parties to Purchaser.

8

Confidential

2.07    Purchase Price Allocation.    The Parties agree that ███████████████ ████████████████████████████████████ of the Purchase Price consideration paid at Closing shall be allocated to intellectual property, goodwill and other intangible assets under Internal Revenue Code Section 197 for federal tax reporting purposes (the "Intangible Assets Allocation"), with the remaining Purchase Price allocable to "*unrealized receivables*" for purposes of Internal Revenue Code Section 1060, including accounts receivable, client cases and Internal Revenue Code Section 1245 recapture items (the "Receivables Allocation"); *provided, however*, that the Intangible Asset Allocation of the Purchase Price may be adjusted downward (but may not be increased) at Seller's written request to Purchaser, after Seller obtains the results of any valuation regarding the fair market value of the Transferred Rights.    Seller Parties shall be responsible for any of their own income taxes attributable to the sale of the Transferred Rights. Each Party agrees to consistently report the transaction for all income tax purposes consistent with such allocation and not take any positions to the contrary or that are inconsistent. The Parties further agree to mutually cooperate, provide information, and file any statements or returns required by the Internal Revenue Service to support this allocation, and to retain such information for a period of four years following the closing, including any Form 8594 filed pursuant to Treasury Regulations promulgated under Section 1060 of the Internal Revenue Code.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

Purchaser hereby represents and warrants to Seller Parties that each of the following statements is true and correct as of the date hereof, and at the time of Closing:

3.01    Existence and Power.    Purchaser is a Mississippi professional limited liability company, duly formed, validly existing, and in good standing under the laws of the State of Mississippi.    Purchaser has all requisite power and authority to own and operate its properties and assets and to carry on its business as now conducted and as presently proposed to be conducted. Purchaser is duly qualified to conduct business as a foreign entity and is in good standing in each jurisdiction where such qualification is necessary.

3.02    Authority.    Purchaser has the full right, power, and legal authority to execute and deliver the Transaction Documents and to consummate the transactions contemplated by the Transaction Documents.

3.03    Capability to Perform.    Purchaser is solvent and has the economic capability to perform its obligations under the Transaction Documents, including the Assumed Liabilities.

3.04    Binding Effect.    The Transaction Documents and the other documents executed or required to be executed by Purchaser in connection with this Agreement have been or will have been duly authorized, executed and delivered by Purchaser and are or will be, when executed and delivered, the legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with their terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting enforcement of creditors' rights generally and by general principles of equity (whether applied in a proceeding at law or in equity).

Confidential

3.05    Brokers' Fees.  Purchaser has no liability to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which the Seller Parties would become liable or obligated.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER PARTIES

Seller Parties hereby jointly represent and warrant to the Purchaser that each of the following statements is true and correct as of date hereof and at the time of the Closing:

4.01    Existence and Power; Good Standing.  Seller is a professional association, duly organized, validly existing, and in good standing under the laws of Mississippi and is qualified to conduct business as a foreign entity and is in good standing in each jurisdiction where such qualification is necessary.  Seller has all requisite power and authority to own and operate its properties and assets and to carry on its business as now conducted and as presently proposed to be conducted.  Each Seller Partner is licensed to practice law in the State of Mississippi and is in good standing in such jurisdiction.

4.02    Title; Fee Agreements and Co-Counsel Agreements.  Schedule 4.02(a) sets forth a correct and complete list of each of the Clients in the Talc Litigation.  Except as set forth on Schedule 4.02(a), no Seller Party or any Affiliate is a party to any Fee Agreement with respect to the Talc Litigation.  Other than for the rights of Seller Parties to receive Proceeds under the Co-Counsel Agreements, there is no other arrangement or agreement (whether written or oral) for any Seller Party or any Affiliate to receive any Proceeds or pay any Case Expenses with respect to the Talc Litigation.  Schedule 4.02(b) sets forth a correct and complete list of the Co-Counsel Agreements to which any Seller Party or its Affiliates is a party or has a right to receive Proceeds with respect to the Talc Litigation, and Seller has provided to Purchaser or it's Representative, correct and complete copies of same.  Each such Co-Counsel Agreement (i) is properly executed and delivered by the Seller Parties, (ii) is valid, binding and enforceable in accordance with its respective terms, (iii) correctly sets forth the fee interest to which the Seller Parties are entitled and such fee interest has not be diluted or otherwise reduced, and (iv) to the best of the Seller Parties' knowledge, is in compliance with all Applicable Laws.  The Seller Parties have correctly and completely disclosed to Purchaser or Representative each of the Seller Parties continuing Case Expenses, and Seller Parties have paid their applicable share of such Case Expenses.

4.03    Ownership; Fee Agreements; Intangibles and Intellectual Property. Seller Parties own the Transferred Rights, free and clear of any Encumbrances, other than for Encumbrances set forth on Schedule 4.09(d) which will be discharged by Seller at or prior to the Closing.  Seller Parties are the owners of the Intangibles and Intellectual Property, the Intangibles and Intellectual Property are free and clear of all Encumbrances other than the Encumbrances listed on Schedule 4.09(d) which will be discharged at or prior to the Closing, and to the best of Seller Parties' knowledge, none of the Intangibles and Intellectual Property has infringed upon, misappropriated, or otherwise violated, and is not infringing upon, misappropriating, or otherwise violating the intellectual property rights (including any trademarks, copyrights, patents or trade secret) of any other Person.  Upon the Closing, Purchaser will be the sole owner of the Intangibles and Intellectual Property.

10

Confidential

4.04    <u>Authority</u>.  Each Seller Party has the full right, power, and legal authority to execute and deliver the Transaction Documents and to consummate the transactions contemplated by the Transaction Documents.

4.05    <u>Non-contravention</u>.  Neither the execution and the delivery of the Transaction Documents, nor the consummation of the transactions contemplated by the Transaction Documents, will (A) to the best of the Seller Parties' knowledge, violate any Applicable Law, or (B) (i) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which any Seller Party is a party or by which any Seller Party is bound or to which the Transferred Rights are subject (ii) result in the creation of any Encumbrance on the Transferred Rights, or (iii) subject to <u>Section 4.07</u>, require any authorization, consent, or approval of any other Person.

4.06    <u>No Litigation</u>.  There are no actions, suits or proceedings pending or threatened against or affecting any Seller Party or its Affiliates, or the Transferred Rights which could adversely impact the consummation of the transactions contemplated by this Agreement, and, to the best of each Seller Party's knowledge, there is no valid basis for any such action, proceeding or investigation.

4.07    <u>Consents</u>.  To the best of the Seller Parties' knowledge, the transfer of the Transferred Rights by the Seller Parties pursuant to the transactions contemplated by this Agreement and the consummation of the transactions contemplated by this Agreement does not require the consent, approval, or authorization of any other Person under the Mississippi Rules.

4.08    <u>Binding Effect</u>.  The Transaction Documents and the other documents executed or required to be executed by the Seller Parties in connection with this Agreement have been or will have been duly authorized, executed and delivered by the Seller Parties and are or will be, when executed and delivered, the legal, valid and binding obligations of Seller and Seller Partners enforceable against Seller and Seller Partners in accordance with their terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting enforcement of creditors' rights generally and by general principles of equity (whether applied in a proceeding at law or in equity).

4.09    <u>Additional Representations of Seller Regarding Transferred Rights</u>.

(a)    No Client has provided notice to any Seller Party of any disagreement or dispute relating to Seller Party's representation of such Client.

(b)    Seller Parties are acting as counsel in the Talc Litigation subject to the terms of the Co-Counsel Agreements.  No Affiliate of any Seller Party is representing any clients relating to the Talc Litigation or has any arrangement with any Co-Counsel relating to the Talc Litigation other than as set forth in the Co-Counsel Agreements.  Seller has provided to Purchaser or Representative a true, correct and complete copy of all Co-Counsel Agreements (including any modifications, amendments, waivers, and supplements thereto).  The Co-Counsel Agreements are in full force and effect and there has been no breach, violation or default by a Seller Party to the knowledge of the Seller Parties.  No Seller Party or its Affiliates have provided to any Co-Counsel or any Client any consent,

Confidential

agreement, inducement or authorization to a reduced or diluted fee share or reimbursable expenses or to any increase in expense obligations, other than as expressly set forth in the Co-Counsel Agreements.  No Seller Party nor any of its Affiliates has directly or indirectly received any notice (whether written or oral) from Co-Counsel or any other Person (other than Purchaser) that (i) any Seller Party is in breach, default or violation, or has not performed its obligations under any Co-Counsel Agreement, or (ii) that such Co-Counsel intends to terminate the Co-Counsel Agreement or not perform its obligations under the Co-Counsel Agreements after the Closing Date; and no Seller Party knows of any action or omission that would be reasonably likely to cause such termination or non-performance.

(c)    Before and after giving effect to the Transaction Documents, no Bankruptcy Event has occurred with respect to any Seller Party, and each Seller Party is solvent and has the economic capability to perform its obligations under the Transaction Documents.

(d)    Except for the Encumbrances disclosed on Schedule 4.09(d) (each of which shall be satisfied and released upon payment of the Purchase Price as provided in this Agreement), no Seller Party has entered into any sale, assignment, financing, or other investment arrangement relating to the Talc Litigation, the Proceeds, or the Transferred Rights and no Seller Party has pledged its rights in the Talc Litigation, the Proceeds, or the Transferred Rights as collateral.

4.10    Brokers' Fees.  No Seller Party or any Affiliate has any liability to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Purchaser would become liable or obligated.

## ARTICLE V
## COVENANTS

Seller Parties jointly and severally covenant and agree as follows:

5.01    Preservation of Existence; Compliance with Laws.  Seller will preserve and maintain its existence, rights, franchises, and privileges in the jurisdiction of its formation, and will qualify and remain qualified in good standing in each jurisdiction where it transacts business at least until the final settlement or resolution of all the Talc Cases covered by the Beasley Allen Co-Counsel Agreement. Seller shall promptly transfer to the Purchaser at Closing, all Client files relating to the Talc Litigation, including all medical records, Books and Records, and other documents for each Client relating to the applicable Transferred Rights and all Intangibles and Intellectual Property. Further, after Closing, Seller Parties will cooperate with Purchaser and Co-Counsel, and execute such additional documents and conveyances as Purchaser may reasonably request to ensure that Purchaser obtains the full benefit of the Transferred Rights.  Seller Parties shall use their respective commercially reasonable best efforts to timely take all actions and do all things necessary or advisable in order to consummate the Transactions, including the satisfaction, but not waiver, of the closing conditions set forth in Article VI.

5.02    Ethics Compliance; Best Efforts; Further Assurances.

(a)    Seller Parties shall comply in all material respects with all Applicable Laws (of which the Seller Parties have knowledge) to effect the transactions contemplated by the

12

Transaction Documents, shall conduct its business in the usual and ordinary course, and shall not take any affirmative action or fail to take any reasonable action to cause any representation or warranty to be inaccurate, incomplete or misleading.  The Seller Parties shall promptly notify Purchaser in writing if any representation or warranty of Seller Parties set forth in this Agreement was untrue when made or of any development occurring after the date of this Agreement that could reasonably be expected to cause, constitute or result in a material breach of any of Seller's representations and warranties set forth in this Agreement, whereupon Purchaser shall have the right to terminate this Agreement under Section 7.03.  At the Closing, Seller Parties shall transfer their Books and Records with respect to each file (including a description of the Case Expenses incurred to date), including all Intangibles and Intellectual Property and all data (whether in digital form or otherwise), medical records and information on each Transferred Interest; and after the Closing, Seller Parties shall promptly forward to Purchaser all calls, emails, and Client inquiries or requests relating to the Transferred Rights; and Seller Parties shall cooperate in a commercially reasonable manner to give the Purchaser the full benefit of the acquisition of the Transferred Rights, including providing all data and Books and Records and Intangibles and Intellectual Property relating to the Transferred Rights.  Seller Parties covenant and agree that any Proceeds relating to any Transferred Rights received by any Seller Party or its Affiliates after Closing shall be held in trust by Seller for the benefit of Purchaser, and Seller shall promptly transfer to Purchaser any such Proceeds.

(b)     Promptly following the execution of this Agreement, Seller shall execute and deliver an irrevocable letter of direction to the Beasley Allen firm, substantially in the form attached hereto as Exhibit B, for all future funds or Proceeds payable to Seller or any Seller Partner from the Talc Litigation to be paid directly to the account designated by Purchaser in such letter and shall use its commercially reasonable efforts to have such letter countersigned by such firm prior to Closing.  In the event that Closing does not occur as provided in this Agreement, the Parties shall mutually cooperate to revoke such letter of direction sent to Beasley Allen.

(c)     Effective as of the Closing, the Seller Parties shall execute an agreement with the Purchaser to terminate the Co-Counsel Agreement between Seller and Purchaser as of the Closing.

(d)     Seller Parties shall execute and enter into such amendments and modifications to the Co-Counsel Agreements to fully vest in Purchaser the Transferred Rights.

5.03   Non-Solicitation.  Seller Parties acknowledge and agree that an integral part of the transactions contemplated by the Transaction Documents is that the Seller Parties agree as follows:

(a)     Each Seller Party agrees that for a period of five (5) years beginning on the Closing Date (the "Restricted Period"), anywhere in the United States, Canada and other jurisdictions where any Clients are located (the "Territory") neither it, nor any of its Affiliates, shall, on its own behalf or on behalf of or in connection with any other Person, directly or indirectly, in any capacity whatsoever (including as an employer, employee, principal, agent, joint venturer, partner, stockholder, member, or other equity holder,

13

Confidential

independent contractor, licensor, licensee, franchiser, franchisee, distributor, consultant, supplier or trustee in respect of or by or through any Person or otherwise) except on behalf of Purchaser and its Affiliates, induce, canvass, solicit, procure or accept the business of, or assist the inducement, canvassing or soliciting, procurement of or acceptance of the business of, any Person that is a Client as of the Closing or former Client within three (3) years prior to the Closing, for purposes of providing services to such Clients and that are competitive with the Talc Litigation or services provided by Purchaser or its Affiliates as it relates to the Transferred Rights. Despite the foregoing, with respect to Persons that are not current or former Clients or known leads or prospects as of the Closing Date, the Restricted Period shall terminate upon the settlement or resolution of all the Talc Cases covered by the Beasley Allen Co-Counsel Agreement.   Seller Parties expressly acknowledge that the provisions in this Section 5.03 are reasonable and valid in all respects and irrevocably waive (and irrevocably agree not to raise) as a defense any issue of reasonableness (including the reasonableness of the activity restrictions, Territory or the duration and scope of this Agreement) in any proceeding to enforce any provision of this Agreement, the intention of the Parties being to provide for the legitimate and reasonable protection of the interests of Purchaser and its Affiliates.

(b)    If a determination is made that any temporal, territorial or activity-related restriction on competition contained in this Agreement is too broad to permit enforcement thereof to its fullest extent, then such restriction shall be enforced to the maximum extent permitted by Applicable Law, and Seller Parties and the Purchaser hereby consent and agree that this Agreement may be  reformed, revised, modified or partially enforced in any proceeding brought by the Purchaser to enforce this Agreement. Subject to the terms of this Section, if any provision of this Agreement is deemed invalid or unenforceable by a court of law, such provision shall be considered to be automatically deleted from this Agreement. Any such deletion shall apply only to that portion of any provision so adjudicated, and the operation of such provision shall only be deemed inapplicable in the particular jurisdiction in which the adjudication is made.

## ARTICLE VI
## CONDITIONS PRECEDENT TO PARTIES' OBLIGATION TO CLOSE

6.01    Conditions Precedent to Purchaser's Obligation to Close. Purchaser's obligation to purchase the Transferred Rights and to take the other actions required to be taken by Purchaser at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Purchaser, in whole or in part):

(a)    *Accuracy of Representations.* All of the Seller's and Seller Partners' representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate in all material respects as of the date of this Agreement, and must be accurate in all material respects as of the Closing Date as if made on the Closing Date and Seller and Seller Partners shall provide a certificate from its Managing Partner (or its equivalent position), or himself with respect to a Seller Partner, certifying same to the Purchaser.

Confidential

(b)     *Seller Parties' Performance*.  All of the covenants and obligations of Seller and Seller Partners that are required to be performed or to be complied with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been duly performed and complied with in all material respects, and Seller and Seller Partners shall provide a certificate from its Managing Partner (or its equivalent position), or himself with respect to a Seller Partner, certifying same to the Purchaser.

(c)     *Payoff Letters*.  Each lender of Seller and any other Person with any Encumbrance on any of the Transferred Rights shall have executed and delivered to Purchaser payoff letters ("Payoff Letters") in acceptable form to Purchaser, which shall fully release any Encumbrances on such Transferred Rights upon payment of the obligations as provided in such Payoff Letters and shall have authorized Seller (or Purchasers on behalf of Seller) to file of record appropriate releases or termination statements evidencing the release of such Encumbrances, and all consents required for the consummation of the transactions contemplated hereby shall have been obtained.

(d)     *No Prohibition*.  Neither the consummation nor the performance of any of the contemplated transactions will, directly or indirectly (with or without notice or lapse of time), contravene, or conflict with, or result in a material violation of, or cause Purchaser or any Person affiliated with Purchaser to suffer any material adverse consequence under, any Applicable Law or rules of any regulatory authority.

(e)     *No Defaults*.  There shall be no default or event of default under any material agreement binding on any Seller Party which could reasonably be expected to adversely affect the ability of Seller Parties to consummate the transactions contemplated by this Agreement.

(f)     *No Material Adverse Effect*.  There shall be no event which could reasonably be expected to have a material adverse effect on any Seller Party or on any of the Talc Cases.

(g)     *Execution and Delivery of the Closing Documents*.  Seller and Seller Partners shall have executed, acknowledged and delivered, as appropriate, to Purchaser all closing documents described in Section 7.02(b).

6.02    Conditions Precedent to Seller Parties' Obligation to Close.  Seller Parties' obligation to sell the Transferred Rights and to take the other actions required to be taken by Seller Parties at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Seller Parties, in whole or in part):

(a)     *Accuracy of Representations*.  All of the Purchaser's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate in all material respects as of the date of this Agreement, and must be accurate in all material respects as of the Closing Date as if made on the Closing Date and Purchaser shall provide a certificate from its Managing Partner (or its equivalent position), certifying same to the Seller Parties.

15

Confidential

(b)    *Purchaser's Performance*.    All of the covenants and obligations of Purchaser that are required to be performed or to be complied with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been duly performed and complied with in all material respects, and Purchaser shall provide a certificate from its Managing Partner (or its equivalent position) certifying same to the Seller.

(c)    *No Prohibition*.    Neither the consummation nor the performance of any of the contemplated transactions will, directly or indirectly (with or without notice or lapse of time), contravene, or conflict with, or result in a material violation of, or cause Seller Parties or any Person affiliated with Seller Parties to suffer any material adverse consequence under, any Applicable Law or rules of any regulatory authority.

(d)    *No Defaults*.    There shall be no default or event of default under any material agreement binding on Purchaser which could reasonably be expected to adversely affect the ability of Purchaser to consummate the transactions contemplated by this Agreement.

(e)    *No Material Adverse Effect*.    There shall be no event which could reasonably be expected to have a material adverse effect on Purchaser.

(f)    *Execution and Delivery of the Closing Documents*.    Purchaser shall have executed, acknowledged and delivered, as appropriate, to Seller Parties all closing documents described in Section 7.02 (a).

## ARTICLE VII
## CLOSING; TERMINATION

7.01    Closing.    Subject to the terms and conditions set forth herein, the Purchase of the Transferred Rights contemplated hereby shall take place at a closing (the "Closing") to be held at 9:00 a.m., Jackson, Mississippi time, on June 1, 2021, assuming all of the conditions to the Closing set forth in Section 6.01 and Section 6.02 have been satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or if such conditions have not been satisfied or waived, such later date which is two (2) Business Days after the date such closing conditions have been satisfied or waived, at the offices of the Smith Law Firm, PLLC, 300 Concourse Blvd, Suite 104, Ridgeland, Mississippi 39157, or at such other time or on such other date or at such other place as the Purchaser and Seller may mutually agree in writing (the day on which the Closing takes place being the "Closing Date").

7.02    Transactions to be Effected at the Closing.

(a)    At the Closing, the Purchaser shall deliver to Seller the Purchase Price payable to Seller subject to the requirements of Section 2.04, by wire transfer of immediately available funds to the Seller and other Persons as set forth in Section 2.04 hereof.    Purchaser shall also execute and deliver to Seller Parties a duly executed counterpart signature of the acceptance by Purchaser of the Assignment of Transferred Rights, the form of which is attached hereto as Exhibit A (the "Assignment"), a unanimous written consent of each of the members of the Purchaser to the Purchase and a certificate from the Purchaser that each representation and warranty of Purchaser is true and correct

16

in all material respects on the date of the Agreement and the Closing Date and the Purchaser is in compliance with and has complied in all material respects with their obligations and covenants under this Agreement

(b)    At the Closing, Seller Parties shall deliver to the Purchaser:

1.    A unanimous written consent of each of the shareholders of the Seller to the Purchase;

2.    A certificate from the Seller and Seller Partners that each representation and warranty of Seller Parties is true and correct in all material respects on the date of the Agreement and the Closing Date and the Seller Parties are in compliance with and have complied in all material respects with their obligations and covenants under this Agreement;

3.    Executed copies of the payoff letters and any other consents;

4.    A duly executed counterpart signature of the Seller Parties of the Assignment;

5.    All of the items referred to in Section 5.02 (b) and Section 5.02(c) to the extent required to be executed at or prior to the Closing; and

6.    Any other documents or instruments reasonably necessary to effect the sale and transfer of the Transferred Rights to Purchaser.

7.03    Termination Events.  By notice given prior to or at the Closing, this Agreement may be terminated as follows:

(a)    by mutual consent of the Purchaser and Seller Parties;

(b)    by Seller Parties or the Purchaser if the Closing has not occurred on or before June 2, 2021, *provided that,* no Party may terminate this Agreement pursuant to this Section in the event such Party is in breach of its obligations under this Agreement;

(c)     the Purchaser if any Seller Party is in breach of any of its representations and warranties or agreements under this Agreement;

(d)    by Seller Parties if the Purchaser is in breach of any of its representations and warranties under this Agreement; or

(e)    by the Purchaser if there is any Bankruptcy Event involving any Seller Party.

7.04    Effect of Termination.  If this Agreement is terminated pursuant to Section 7.03, all obligations of the Seller, Seller Partners and Purchaser under this Agreement will terminate and shall forthwith become void and have no effect without any liability on the part of either of the Seller, Seller Partners or Purchaser hereto, except in the event of a termination by Purchaser pursuant to Section 7.03(c) or Section 7.03(e) hereof, or a termination by Seller pursuant to Section

17

7.03(d) hereof, each of the Seller or Purchaser, as applicable, shall be entitled to such indemnification rights as provided in Section 8.01.

## ARTICLE VIII
## INDEMNITY

8.01    Indemnity.

(a)    *Purchaser's Indemnity*.  Purchaser hereby agrees to indemnify, hold harmless and defend Seller Parties and Seller Parties' shareholders, directors, partners, members, officers, representatives, agents, advisors, attorneys, accountants, successors and assigns ("Seller Indemnitees") from and against any and all liability, loss, damage, claim, cause of action, and expenses, including reasonable attorneys' fees (collectively "Loss" or "Losses"), arising out of (i) a breach of any of the representations and warranties made by Purchaser to Seller Parties in the Transaction Documents, (ii) a breach of any covenant or obligation of the Purchaser in the Transaction Documents, and (iii) any Assumed Liabilities.

(b)    *Seller's and Seller Partners' Indemnity*.  Seller and Seller Partners hereby agree jointly and severally, to indemnify, hold harmless and defend Purchaser and Purchaser's partners, managers, officers, representatives, agents, advisors, attorneys, accountants, successors and assigns ("Purchaser Indemnitees") from and against any and all Losses arising out of (i) a breach of any of the representations and warranties made by Seller or any Seller Partner to Purchaser in the Transaction Documents, (ii) any breach of any covenant or obligation of Seller or any Seller Partner in the Transaction Documents, and (iii) any Retained Liabilities.

(c)    *Payment of Claims*.

(i)    The Indemnifying Party shall satisfy its obligations under this Article VIII by wire transfer of immediately available funds within 10 Business Days after (i) a final agreement of the Indemnified Party and Indemnifying Party regarding the amount thereof, or (ii) the issuance of a final, non-appealable arbitration award pursuant to this Agreement or, if applicable, a binding, and non-appealable judgment of a court of competent jurisdiction with respect thereto.  If an Indemnifying Party does not make full payment of any such obligations within such 10 Business Day period, any amount thereafter payable shall accrue interest from the first day of such 10 Business Day period to and including the date such payment is made at a rate per annum equal to ten percent (10%).  Such interest shall be calculated daily on the basis of a 365-day year and the actual number of days elapsed, without compounding.

(ii)    All wire transfers (or payments) contemplated under this Article VIII shall be made to the account or accounts (or address) designated for an Indemnified Party to such account or accounts (or address) specified in a written notice delivered by the Indemnified Party to the Indemnifying

18

Confidential

Party a reasonable amount of time prior to the Indemnifying Party making the relevant wire transfer (or payment).

8.02    Scope of Indemnification.  THE INDEMNITIES SET FORTH IN SECTION 8.01 ARE INTENDED TO BE ENFORCEABLE AGAINST THE PARTIES AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS IN ACCORDANCE WITH THE EXPRESS TERMS AND SCOPE THEREFORE NOTWITHSTANDING ANY EXPRESS NEGLIGENCE RULE OR ANY SIMILAR DIRECTIVE UNDER APPLICABLE LAW THAT WOULD PROHIBIT OR OTHERWISE LIMIT RELEASES OR INDEMNITIES BECAUSE OF THE SIMPLE OR GROSS NEGLIGENCE (WHETHER SOLE, CONCURRENT, ACTIVE OR PASSIVE) OR OTHER FAULT OR STRICT LIABILITY OF ANY OF THE RELEASED PARTIES.

8.03    Survival; Reliance.  The representations and warranties contained in or made pursuant to this Agreement will survive the execution and delivery of this Agreement and the Closing and will continue until the three (3) year anniversary of the Closing Date; *provided,* that the Fundamental Representations and Warranties will survive until the seven (7) year anniversary of the Closing Date. The covenants and obligations contained in this Agreement which require performance after the Closing Date shall survive the Closing Date in accordance with their respective terms; *provided,* that the covenants and obligations required to be performed prior to the Closing Date shall survive until the three (3) year anniversary of the Closing Date.

## ARTICLE IX
## MISCELLANEOUS PROVISIONS

9.01    Entire Agreement; Amendment.  This Agreement and the Co-Counsel Agreements constitute the entire agreement of the Parties with respect to the subject matter hereof, supersedes any and all prior written agreements between the Parties, and contains all of the covenants, promises, representations and agreements between the Parties with respect to the subject matter hereof. Each Party to this Agreement acknowledges that no representation, inducement, promise or agreement, oral or written, has been made by any Party that is not embodied herein, or referred to hereby and that no agreement, statement or promise relating to the subject matter hereof which is not contained or provided for, identified or referred to in this Agreement, shall be valid or binding. Any modification of this Agreement shall be effective only if it is in writing and signed by the Parties.

9.02    No Third Party Beneficiary.  Nothing expressed or referred to in this Agreement will be construed to give any person other than the Parties to this Agreement and the Indemnified Parties in Section 8.01 any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.  This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the Parties to this Agreement and their successors and assigns.

9.03    Delivery.  This Agreement and any amendments hereto, to the extent signed and delivered by means of a facsimile machine or in portable document format ("PDF"), shall be treated in all manners and respects as an original and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.  At the request of any Party hereto each other Party hereto shall re-execute original forms hereof and deliver them to

19

Confidential

all other Parties.  No Party hereto shall raise the use of a facsimile machine or PDF to deliver a signature or the fact that any signature was transmitted or communicated through the use of facsimile machine or PDF as a defense to the formation of a contract and each such Party forever waives any such defense.

9.04   Expenses.  Except as otherwise expressly provided for in this Agreement, each of the Parties will pay the fees and expenses of such Party's agents, representatives, accountants and counsel incurred in connection with this Agreement and the transactions contemplated hereby.

9.05   Assignment.  This Agreement may not be assigned by any Party without the prior written consent of the other Parties, and any assignment without such consent shall be void and without effect, *provided, however,* that Purchaser may (i) assign any or all of its rights and interests hereunder to one or more of its Affiliates or, for collateral security purposes, to any Person providing financing to Purchaser, and (ii) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases Purchaser nonetheless shall remain responsible for the performance of all of its obligations hereunder).

9.06   Successors and Assigns.  Subject to Section 9.05, this Agreement shall inure to the benefit of and be binding upon the heirs, executors, administrators, successors, assigns and representatives of each of the Purchaser and Seller Parties.

9.07   Severability.  If any term, provision, covenant or remedy of this Agreement or the application thereof to any person or circumstances shall, to any extent, be construed to be invalid or unenforceable in whole or in part, then such term, provision, covenant or remedy shall be construed in a manner so as to permit its enforceability under the Applicable Law to the fullest extent permitted by law. In any case, the remaining provisions of this Agreement or the application thereof to any person or circumstances, other than those to which they have been held invalid or unenforceable, shall remain in full force and effect.

9.08   Captions.  The captions used in this Agreement have been inserted only for reference purposes.  The captions and order of such captions shall not be deemed to govern, limit, modify, or in any manner affect the scope, meaning, or intent of any of the provisions and/or terms of this Agreement, nor shall any captions be given any legal effect.

9.09   Notices.  All notices, requests, demands, claims, and other communications pertaining to this Agreement ("Notices") must be in writing, must be sent to the addressee at the address set forth in this Section 9.09, or at such other address as the addressee has designated by a Notice given in the manner set forth in this Section 9.09, and must be sent by (a) courier, hand or overnight express, (b) prepaid, certified U.S. mail, or (c) by facsimile or email of a PDF document (with confirmation of transmission).  Notices will be deemed given when delivered and receipted for (or when attempted delivery is refused at the address where sent), or, with regard to Notices sent via prepaid, certified U.S. mail, at the time indicated on the certificate of mailing properly obtained from the U.S. Post Office, or on the date sent if sent by facsimile or email if sent during normal business hours of the recipient; provided, however, that Notices received or delivered after 5:00 p.m. any Business Day and before 8:59 a.m. the next Business Day, local time of the destination address, will be deemed given at 9:00 a.m. on the next such Business Day.  The addresses for Notices are as follows:

Confidential

Purchaser:         Smith Law Firm PLLC
                   300 Concourse Blvd, Suite 104
                   Ridgeland, Mississippi 39157
                   Attn: Allen Smith
                   Email: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Seller:            Porter & Malouf, P.A.
                   825 Ridgewood Road
                   Ridgeland, Mississippi 39157
                   Attn: Patrick Malouf
                   Email: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Seller Partners:   Patrick Cash Malouf
                   825 Ridgewood Road
                   Ridgeland, Mississippi 39157
                   Email: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

                   Timothy W. Porter
                   825 Ridgewood Road
                   Ridgeland, Mississippi 39157
                   Email: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9.10    Further Assurances. Each Party covenants that at any time, and from time to time after the date hereof, it will execute such additional instruments and take such actions as may be reasonably requested by the other Parties to confirm or perfect or otherwise to carry out the intent and purposes of this Agreement, including complying with requests by another Party (at the sole cost and expense of the requesting Party unless such information otherwise was required to have been delivered to the requesting Party by the requested Party pursuant to the Transaction Document) for information necessary for tax compliance or other legal compliance.

9.11    Governing Law. The laws of the State of Mississippi will govern the interpretation, validity and effect of this Agreement without regard to the place of execution or the place of performance thereof, and the Parties agree that the state and federal courts situated in Madison County, Mississippi shall have personal jurisdiction over the Parties to hear all disputes arising out of this Agreement, subject to Section 9.12. This Agreement is performable in Madison County, Mississippi and, as such, the Parties agree that venue shall exclusively lie within the state or federal courts in Madison County, Mississippi to hear such disputes, subject to Section 9.12.

9.12    Arbitration. Except for matters covered by Sections 5.03 (Non-Solicitation) and 9.13 (as it relates to specific performance), with respect to which a Party may elect to pursue any remedy available in law or in equity, including seeking injunctive or equitable relief, or seeking a restraining order, temporary injunction and/or permanent injunction (mandatory and/or inhibitory) to compel performance with this Agreement, in the event that any dispute (other than one that requires injunctive relief) between any of the Parties or claim by a Party against another Party arising out of or in relation to this Agreement or in relation to any alleged breach hereof cannot be resolved, such dispute or claim shall be finally determined by arbitration in accordance with the rules then in force of the American Arbitration Association. The arbitration proceedings shall take place exclusively in Madison County, Mississippi, or such other location as the Parties in dispute

21

Confidential

hereafter may agree upon in writing. There shall be one arbitrator, as shall be agreed upon by the Parties in dispute, who shall be an individual skilled in the legal and business aspects of the subject matter of this Agreement and of the dispute. In the absence of such agreement, each Party in dispute shall select one arbitrator and the arbitrators so selected shall select a third arbitrator. In the event the arbitrators cannot agree upon the selection of a third arbitrator, such third arbitrator shall be appointed by the American Arbitration Association at the request of any of the Parties in dispute. The arbitrators shall be individuals skilled in the legal and business aspects of the subject matter of this Agreement and of the dispute. The decision rendered by the arbitrator or arbitrators shall be accompanied by a written opinion in support thereof. The decision of the arbitrator or arbitrators shall be final and binding upon the Parties in dispute without right of appeal. Judgment upon any such decision may be entered into in any court having jurisdiction thereof, or application may be made to such court for a judicial acceptance of the decision and an order of enforcement. Costs of the arbitration shall be assessed by the arbitrator or arbitrators against any or all of the Parties in dispute, and shall be paid promptly by the Party or Parties so assessed. Notwithstanding the foregoing, to the extent that a Party seeks injunctive or equitable relief, such Party shall have the option to pursue such claim directly with a court of competent jurisdiction in lieu of submitting such claim to arbitration.

9.13    Remedies. If any Party is in breach of any of the promises and covenants set forth in this Agreement, the aggrieved Party shall have the right, without in any way limiting any other legal or equitable remedy available to it, to specific performance of the Agreement, any and all damages resulting from the breach, and any attorneys' fees and costs incurred in bringing the action. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies at law or in equity or otherwise.

9.14    Multiple Counterparts. This Agreement may be executed in one or more counterparts (including electronically by means of portable document format (PDF) or facsimile signatures), each of which when executed and delivered shall be an original and all of which when executed shall constitute one and the same instrument and agreement. The Agreement shall be deemed executed in the State of Mississippi.

9.15    Confidentiality. Each Party agrees not to disclose the terms and contents of this Agreement to any Persons, except with the prior written consent of the other Parties, other than its respective accountants, financing partners, partners, attorneys, and tax advisors with a need to know the information contained herein, and then, only to the extent so necessary. Notwithstanding the foregoing, after Closing, Purchaser shall be permitted to make announcements concerning this Agreement and the transactions hereunder and communicate with employees, Clients and it's Co-Counsel without the consent of Seller Parties, to the extent in compliance with Applicable Laws.

9.16    Drafting. The Parties acknowledge that each was actively involved in the negotiation and drafting of this Agreement and that no law or rule of construction shall be raised or used in which the provisions of this Agreement shall be construed in favor or against the Parties hereto because one is deemed to be the author thereof.

9.17    Counsel. The Parties hereto each state that they have read this Agreement carefully, that they have consulted with counsel regarding the terms and provisions of this Agreement (or have had the opportunity to consult with legal counsel and chosen not to do so), and that they have

22

Confidential

relied solely upon their own judgment without the influence of anyone in entering into this Agreement.

9.18    Schedules.  The Parties agree that the schedules attached hereto may be amended, supplemented or updated prior to the Closing Date, by a writing agreed to and signed by the Parties.

**[REMAINDER OF PAGE INTENTIONALLY BLANK.
SIGNATURE PAGE FOLLOWS.]**

23

Confidential

IN WITNESS WHEREOF, the undersigned have hereunto set their hands, fully read and fully understand this Agreement, the contents and/or provisions thereof, as of the first date set forth above.

PURCHASER:

SMITH LAW FIRM, PLLC,
a Mississippi professional limited liability company

By: _____
Name: _____R. Allen Smith Jr_____
Title: _____owner / attorney_____

SELLER:

PORTER & MALOUF, P.A., a Mississippi
professional association

By: _____
Name: _____Tim Porter_____
Title: _____President_____

SELLER PARTNERS:

_____
Timothy W. Porter Esq.

_____
Patrick Cash Malouf, Esq.

*[SIGNATURE PAGE TO PURCHASE AGREEMENT]*

Confidential

**Schedule 2.04(a)**

**AMOUNTS TO BE PAID TO SELLER'S LENDERS**

████████████ payable to Counsel Financial (amount determined as of May 17, 2021 to be updated as of the Closing Date) with per diem interest at ████████    A second loan payable to Counsel Financial with outstanding principal and interest of approximately ████████

---

[1] Payoff amount to be updated prior to Closing based on per diem interest amounts accrued at Closing.

Schedule 2.04(a)

Confidential

## Schedule 4.02(a)

## TALC LITIGATION CLIENTS

List of Talc Litigation cases contained in that certain Excel Spreadsheet emailed by Patrick Malouf to Representative on March 29, 2021 at 12:21 p.m., which list is deemed incorporated herein by reference.

Schedule 4.02(a)

Confidential

**Schedule 4.02(b)**

**CO-COUNSEL AGREEMENTS**

1.   Letter Agreement dated December 19, 2013 by and among Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., Allen Smith, Patrick Malouf and Tim Porter on behalf of their respective firms, as may be amended, modified, or supplemented from time to time.

2.   Co-Counsel Agreement between Smith Law Firm PLLC and Porter & Malouf, P.A. (undated).

3.   Letter Agreement dated May 30, 2014 by and among Porter & Malouf, P.A., the Onder Law Firm, the Smith Law Firm, PLLC and Beasley Allen.

Schedule 4.02(b)

Confidential

**Schedule 4.09(d)**

**DISCLOSED ENCUMBRANCES**

Lien and security interest in favor of Counsel Financial or its representative CT Corporation Services, as set forth in those UCC Financing Statements filed with the UCC Division of the Mississippi Secretary of State, filing numbers ███████████ and ███████████ against Porter & Malouf, P.A., as Debtor.

Confidential

# EXHIBIT A

## ASSIGNMENT OF TRANSFERRED RIGHTS

(See attached).

Confidential

**BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

This BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is entered into on May __2021, by and among Smith Law Firm, PLLC, a Mississippi professional limited liability company ("Purchaser"), on the one hand, and Porter & Malouf P.A., a Mississippi professional association ("Seller") and each of its shareholders Timothy W. Porter, Esq., a resident of Mississippi ("Porter") and Patrick Cash Malouf, Esq., a resident of Mississippi ("Malouf"), each of Porter and Malouf collectively the "Seller Partners" or individually a "Seller Partner"). The Seller and together with the Seller Partners collectively are the "Seller Parties" or individually a "Seller Party". The Purchaser and the Seller Parties are sometimes hereinafter referred to collectively as the "Parties" and are each sometimes hereinafter referred to as a "Party".

**RECITALS**

**WHEREAS**, pursuant to and in connection with that certain Purchase Agreement, dated as of May 17, 2021 by and among Purchaser, Seller and the Seller Partners (the "Purchase Agreement"), Seller Parties desires to assign, transfer, sell, convey and deliver to Purchaser, and Purchaser desires to acquire from Seller Parties all of Seller Parties' right, title and interest in and to, the Transferred Rights (the "Sale");

**WHEREAS**, pursuant to and in connection with the Purchase Agreement, Seller Parties desire to assign to Purchaser, and Purchaser desires to assume from Seller Parties, the Assumed Liabilities and any other obligations expressly assumed by Purchaser under Section 2.03 of the Purchase Agreement (the "Other Obligations")(the "Assignment and Assumption"); and

**WHEREAS**, in order to effect the Sale and the Assignment and Assumption, the Parties desire to enter into this Agreement.

**NOW, THEREFORE**, in consideration of the premises, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in furtherance of the transactions contemplated by the Purchase Agreement, the Parties agree as follows:

**AGREEMENT**

1.     Defined Terms. All capitalized terms used herein that are not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

2.     Assignment and Transfer. As of the Closing Date, Seller Parties hereby assign, transfer, sell, convey and deliver to Purchaser, its successors and assigns, and Purchaser hereby accepts all of Seller Parties' right, title and interest in and to, the Transferred Rights, free and clear of all Encumbrances, and subject to the terms and conditions of the Purchase Agreement.

3.     Assumption of Liabilities. As of the Closing Date, Seller Parties hereby assign to Purchaser and Purchaser hereby accepts such assignment from Seller Parties and assumes, the Assumed Liabilities and the Other Obligations. Purchaser agrees to perform the obligations of Seller Parties with respect to the Assumed Liabilities and the Other Obligations.

Exhibit A-1

Confidential

Seller Parties shall remain responsible for and shall perform all their obligations with respect to the Retained Liabilities.

4.    Further Acts and Assurances.  Seller Parties will execute and deliver from time to time hereafter, at the request of Purchaser, all such further instruments of conveyance, assignment and further assurances as may reasonably be required in order to vest in and confirm to Purchaser all of Seller Parties' right, title and interest in and to the Transferred Rights and Purchaser's assumption of the Assumed Liabilities and the Other Obligations, and to otherwise carry out the provisions of this Agreement.

5.    Terms of the Purchase Agreement.  The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements and indemnities relating to the Transferred Rights, Assumed Liabilities, the Other Obligations, and Retained Liabilities are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be modified, enlarged or superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

6.    No Third Party Beneficiaries.  Nothing expressed or referred to in this Agreement will be construed to give any person other than the Parties to this Agreement and the indemnified parties in Section 8.01 of the Purchase Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.  This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the Parties to this Agreement and their successors and assigns.

7.    Entire Agreement.  This Agreement and the Purchase Agreement constitute the entire agreement among the Parties and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

8.    Governing Law.  This Agreement shall be governed by the internal laws of the State of Mississippi as to all matters, including matters of validity, construction, effect, and performance.

9.    Counterparts.  This Agreement may be executed in multiple counterparts (including by means of telecopied or PDF signature pages), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Counterpart signatures need not be on the same page and shall be deemed effective upon receipt.

10.    Successors and Assigns. This Agreement may not be assigned by any Party without the prior written consent of the other Parties, and any assignment without such consent shall be void and without effect, *provided, however,* that Purchaser may (i) assign any or all of its rights and interests hereunder to one or more of its Affiliates or, for collateral security purposes, to any Person providing financing to Purchaser, and (ii) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases Purchaser nonetheless shall remain

Confidential

responsible for the performance of all of its obligations hereunder). Subject to this <u>Section 10</u>, this Agreement shall inure to the benefit of and be binding upon the heirs, executors, administrators, successors, assigns and representatives of each of the Purchaser and Seller Parties.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first written above.

**SELLER:**

PORTER & MALOUF, P.A., a Mississippi professional association

By: _____
Name: _____
Title: _____

**SELLER PARTNERS:**

_____
Timothy W. Porter Esq.

_____
Patrick Cash Malouf, Esq.

**PURCHASER:**

SMITH LAW FIRM PLLC,
a Mississippi professional limited liability company

By: _____
Name: _____
Title: _____

Exhibit A-3

Confidential

**EXHIBIT B**

**FORM OF IRREVOCABLE LETTER OF DIRECTION**

(See attached).

Exhibit B

Confidential

## HLF INSTRUCTION LETTER

PORTER & MALOUF, P.A.
825 RIDGEWOOD ROAD
RIDGELAND, MISSISSIPPI  39157

May __, 2021

**By Email:** ███████████████████████
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
Attn:  Andy Birchfield
218 Commerce Street
Montgomery, Alabama  36103-4160

      Re:    <u>Irrevocable Letter of Instruction</u>

Ladies and Gentlemen,

We have entered into an arrangement with you regarding the handling of certain cases for certain of our clients.  We hereby authorize and instruct you that all future payments attributable to the cases which you are handling for clients of Porter & Malouf, P.A., Tim Porter, and/or Patrick Malouf (collectively the "<u>Firm</u>"), which would otherwise be paid to the Firm, related to the Talc Litigation should be paid to the below account in accordance with the following instructions:

    **Account Name/Owner:**  Smith Law Firm, PLLC, ASPM – Talc
    **Institution:** ██████████
    **Routing Number:** ██████████
    **Account Number:** ██████████
    **Bank  Address:** █████████████████████████████████████
    ██████████████

The Handling Law Firm, by its signature below, acknowledges that only proceeds due and payable to the Firm shall be deposited in the above account and in no event shall any funds due to third parties, specifically any client, be deposited into the above account.

By your signature below, you hereby acknowledge receipt of this letter and agree to be bound pursuant to the provisions hereof.

Thank you for your assistance.  Please contact the undersigned with any questions.

Yours very truly,

PORTER & MALOUF, P.A.

By:_____
Name:  <u>Tim Porter</u>
Title:  <u>President</u>

Exhibit B-1

Confidential

By: _____
Name:  Tim Porter, individually _____


By: _____
Name:  Patrick Malouf, individually _____


**AGREED TO AND ACCEPTED:**

this _____ day of _____, 2021

BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.


By: _____
Name:  Andy Birchfield _____
Title: _____

Exhibit B-2

Confidential