# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

BEASLEY, ALLEN, CROW,             *
METHVIN, PORTIS and MILES, P.C.,  *
                                  *
    Plaintiff,   *
                                  *
v.                                *    Case No. 2:24-cv-582-RAH-JTA
                                  *
PORTER MALOUF, P.A.,              *
                                  *
    Defendant/Crossclaim Plaintiff,    *
                                  *
v.                                *
                                  *
THE SMITH LAW FIRM, PLLC and      *
ROBERT ALLEN SMITH, JR.,          *
                                  *
    Defendant/Crossclaim Defendant.    *

_____

THE SMITH LAW FIRM, PLLC,         *
                                  *
    Plaintiff,   *
                                  *
v.                                *    Case No. 2:25-cv-183-RAH-JTA
                                  *
BEASLEY, ALLEN, CROW,             *
METHVIN, PORTIS and MILES, P.C.,  *
et al.,                           *
                                  *
    Defendants.  *

## SECOND AMENDED COMPLAINT

### PARTIES

1.      Plaintiff Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. ("Beasley Allen") is an Alabama Professional Corporation with its principal place of business in Montgomery County, Alabama.

2.      Defendant The Smith Law Firm, PLLC ("Smith Law") is, upon information and belief, a Mississippi Professional Limited Liability Company whose sole member is Allen Smith, a resident citizen of the State of Mississippi.  Smith Law may be served through its registered agent Robert Allen Smith, Jr., 300 Concourse Blvd., Suite 104, Ridgeland, MS 39157.

3.      Defendant Robert Allen Smith, Jr. ("Smith")[1] is a licensed attorney and a resident citizen of the State of Mississippi.  Smith may be served at 224 Hidden Oaks Drive, Ridgeland, MS 39157.

4.      Defendant Porter Malouf, P.A. ("Porter Malouf") is, upon information and belief, a Mississippi Professional Association.  Upon information and belief, the individual members of Porter Malouf are Tim Porter and Patrick Malouf, each of whom are resident citizens of the State of Mississippi.  Porter Malouf may be served

---

[1] Defendants Smith Law and Smith will be collectively referred to hereinafter as the "Smith Defendants".

through its registered agent Patrick C. Malouf, 825 Ridgewood Road, Ridgeland, MS 39157.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that this is an action where the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States.

6.     This Court has personal jurisdiction over the Defendants as the claims of Beasley Allen arise out of or relate to the Defendants' contacts with Alabama and the Defendants each purposefully availed themselves of the privilege of conducting activities within Alabama, as described in more detail herein.

7.     Venue for this action is appropriate in the Middle District of Alabama in that a substantial part of the events or omissions giving rise to the claim occurred here.  28 U.S.C. § 1391(b)(2).

## STATEMENT OF FACTS

8.     Beasley Allen is a plaintiffs' personal injury law firm that, among other areas, specializes in mass tort lawsuits.

9.     In November 2013, Beasley Allen began showing interest in representing cancer victims in claims against Johnson & Johnson relating to its sale of talc-based Baby Powder and Shower to Shower ("Talcum Powder Litigation").

10.     Defendants had been involved in investigating such claims for some

time and were the first to try a talcum powder case to verdict against Johnson &
Johnson, the case of *Berg v. Johnson & Johnson*, in October 2013.

11.    In December 2013, Defendant Smith reached out to Beasley Allen in
Montgomery, Alabama to discuss Beasley Allen's interest in and the potential for a
joint venture on Talcum Powder Litigation.

12.    A short time later, Defendants traveled to Montgomery to meet with
Beasley Allen lawyers.  During the meeting, Defendants shared with Beasley Allen
the evidence they had gathered regarding the Talcum Powder Litigation and
promoted the experience, experts, effort, and ability they and their law firms could
bring to a joint venture agreement.

13.    At the time, the Smith Defendants already had a joint venture
agreement with Defendant Porter Malouf.

14.    After further discussions and negotiations between the parties regarding
the terms of an agreement, ultimately a joint venture agreement dated December 19,
2013, and signed on January 23, 2014, was entered between Beasley Allen, Smith
Law, and Porter Malouf for the handling of Talcum Powder Litigation (the "JV
Agreement"). Thereafter, the parties orally agreed and later confirmed in writing that
Beasley Allen would handle all global settlement negotiations with Johnson &
Johnson.  Consistent with their oral agreement, the course of the parties'
performance under the JV Agreement was that Beasley Allen partner Andy

4

Birchfield handled all global settlement negotiations with Johnson & Johnson.

15.    It was anticipated by the parties to the JV Agreement that a large amount of the work of the joint venture would be performed at Beasley Allen's office in Montgomery, Alabama, where all future and existing talcum clients were to be directed for in-take, obtaining authorizations and medical records, screening, signing up, and handling.

16.    Under the JV Agreement, Beasley Allen was responsible for 50% of the work and Smith Law and Porter Malouf were responsible for 50% of the work on the Talcum Powder Litigation going forward.

17.    The JV Agreement further provided that Beasley Allen would "be responsible for all client contact."   In fact, during the course of the parties' performance of the JV Agreement, Beasley Allen handled all mass communications with the clients and the day-to-day individual communications with clients.

18.    After working together to make filing determinations and timely filings, the JV Agreement provided that the parties would be jointly responsible for prosecuting the cases and would work together in doing so.

19.    The JV Agreement provided that "all" of the talcum powder clients of each party be jointly represented by the parties to the JV Agreement.

20.    The JV Agreement provided that expenses incurred in connection with the talcum powder litigation be shared proportionally based on each party's

percentage interest in any fee, with Beasley Allen responsible for 50% and Smith Law/Porter Malouf responsible for 50%. Such expenses were to be reconciled on a quarterly basis beginning in April of 2014.

21.    The parties to the JV Agreement implicitly and necessarily agreed that in connection with their representation of the clients of the joint venture, they would place the interests of the clients ahead of their own personal interests and would avoid any relationships or entanglements that would jeopardize their ability to do so.

22.    Subsequent to entry of the JV Agreement, over eleven thousand five hundred clients with talcum powder claims became jointly represented under the joint venture, including over 530 clients residing in Alabama. As contemplated by the JV Agreement, those clients were directed to Beasley Allen's office in Montgomery, Alabama for in-take, obtaining authorizations and medical records, screening, signing up, and handling.

23.    Beasley Allen has fronted the overwhelming majority of the expenses relating to the Talcum Powder Litigation from its office in Montgomery, Alabama, resulting in Smith Law and Porter Malouf being required under the JV Agreement to make quarterly payments to Beasley Allen in Montgomery, Alabama to reconcile the expenses. These quarterly reconciliation payments from the Defendants to Beasley Allen, which began in 2014, total more than $15 million.

24.    The joint venture has been managed, administered, and primarily

performed from Beasley Allen's office in Montgomery, Alabama.

25.     Not only has the Talcum Powder Litigation been extremely expensive to pursue, it has also been extremely labor intensive and time-consuming. Although the Defendants were active for the first several years of the joint venture, as the years have passed and the expenses and amount of work has increased, Beasley Allen had to hire additional staff and commit extensive personnel from its Montgomery, Alabama office for the management and prosecution of the Talcum Powder Litigation. Meanwhile, engagement by the Defendants has diminished to the point that they have not performed anywhere near 50% of the work as required by the JV Agreement.

26.     For example, over five hundred and sixty depositions have been taken in connection with the claims of the joint venture clients. However, the Smith Defendants have only covered twenty-one of those, and Porter Malouf has only covered fifty-seven of those (collectively less than 14% of the depositions), leaving Beasley Allen to cover the rest.

27.     As the years passed and expenses mounted, the Smith Defendants fell behind on their obligation to share expenses.

28.     During the course of the Talcum Powder Litigation, the Smith Defendants have borrowed ███████████████ from litigation funding lenders. While those loans do not pertain to Beasley Allen nor the individual talc clients, the

Smith Defendants' loans are ███████████████████████████████
████████████████████████████████.  Instead of using the
proceeds from these loans to represent the clients and fulfill their obligations to the
joint venture, the Smith Defendants used a substantial amount of that funding to
secretly ██████████████████████████, obtain and litigate non-
talc cases, and  acquire additional talc claims – many of which the Smith Defendants
then hid from Beasley Allen by failing to transfer those clients to Beasley Allen for
signing and/or handling.

29.    Ultimately, Defendants Smith Law and Porter Malouf have failed to
comply with their obligation under the JV Agreement to pay 50% of the expenses
on a quarterly basis.  Defendants Smith Law and Porter Malouf have failed to make
all quarterly expense reconciliation payments to Beasley Allen since the third quarter
of 2023 and currently owe Beasley Allen at least $735,584.67 for their half of
expenses which have been invoiced but not paid.

30.    In the Fall of 2023, after learning that the Smith Defendants had
borrowed excessively from a litigation funding lender and then after learning more
about the extent of the Smith Defendants' financial distress arising from the
litigation funding, Beasley Allen, at Defendant Smith's request, agreed to meet with
the lenders for the Smith Defendants in an effort to work constructively towards a
way to help resolve their financial problems.

31.    It was in connection with those discussions with the lenders for the Smith Defendants that, in the late Summer or Fall of 2023, Beasley Allen learned that the Smith Defendants had bought out Porter & Malouf's interest in the JV Agreement two years earlier, materially changing the nature of the agreement.

32.    Following the buy-out of Porter & Malouf, and for the purpose of concealing the buy-out from Beasley Allen, the Smith Defendants had Porter & Malouf continue to make the quarterly expense payments to Beasley Allen (funded solely with the Smith Defendants' money) so that it appeared that Porter Malouf remained an active participant in the JV Agreement.

33.    In January of 2024, Beasley Allen learned for the first time that the Smith Defendants had not in fact transferred all talcum powder clients to Beasley Allen for signing and handling as required by the JV Agreement but had instead kept a substantial number of such clients a secret from Beasley Allen.

34.    Based on information and belief, the Smith Defendants were paid a fee to try a Talc case which they kept for themselves and did not share with the other members of the joint venture as required by the JV Agreement.

35.    Eventually defaulting on ██████████ of litigation funding debt, the financial crisis of the Smith Defendants grew to the point that they began actively and secretly undercutting Beasley Allen in global settlement negotiations with Johnson & Johnson in what appeared to be an effort to obtain a settlement that

would alleviate their extreme financial problems, but which would not in Beasley Allen's opinion be in the best interest of the jointly represented clients.

36.    Beasley Allen has now learned that Smith Law defaulted on its ▬▬▬▬ litigation funding debt as far back as ▬▬▬▬ .

37.    

38.    By October of 2024, the amount of litigation funding debt Smith Law had defaulted on exceeded ▬▬▬▬ Today, that amount exceeds ▬▬▬▬ .

39.    The Smith Defendants have never disclosed to the joint venture clients the ▬▬▬▬ of their debt or the fact that they are in default. The Smith Defendants have never sought consent from the clients of the joint venture clients to continue representing them despite this ▬▬▬▬ debt default.

40.    Prior to May of 2024, Johnson & Johnson has twice attempted, and failed, to use bankruptcy in an effort to dodge its legal responsibility to provide fair and timely compensation to talc victims. Beasley Allen and the Smith Defendants opposed these prior bankruptcy attempts by Johnson & Johnson.

41.    In May 2024, Johnson & Johnson proposed a third bankruptcy plan to

resolve the Talcum Powder Litigation. However, for this proposed "pre-packaged" bankruptcy plan to be filed, Johnson & Johnson needed 75% of talcum powder claimants to vote in favor of the plan by the July 26, 2024, voting deadline.

42.    The proposed resolution of the Talcum Powder Litigation associated with the contemplated third bankruptcy failed to provide fair, timely, and certain compensation to the jointly represented clients.  As a result, Beasley Allen – with the knowledge and consent of the Smith Defendants - sent multiple communications to the jointly represented clients regarding the proposed plan and hosted Town Hall Zoom meetings on July 3, 2024, recommending to the jointly represented clients that they vote against this proposed third bankruptcy plan.

43.    On July 26, 2024, Beasley Allen submitted a master ballot on behalf of the jointly represented clients reflecting that 11,434 clients voted to reject the bankruptcy plan and 69 voted to accept the bankruptcy plan.

44.     On August 9, 2024, the solicitation agent for the proposed bankruptcy plan reported that less than the required 75% of claimants had voted to accept the plan.

45.    In an effort to garner additional support for the plan, Johnson & Johnson surreptitiously and selectively extended the voting deadline.

46.    At the same time, because Johnson & Johnson had been unsuccessful in forcing Beasley Allen to agree to its proposed settlement terms, Johnson &

Johnson began or resumed secret negotiations with the Smith Defendants, hopeful that they might prove to be more agreeable to their demands. The Smith Defendants injecting themselves into the global settlement negotiations was contrary to the agreement of the parties that Beasley Allen was to handle such negotiations and was contrary to the parties' course of performance under the JV Agreement.

47.    Despite agreeing and acknowledging that Andy Birchfield with Beasley Allen was to handle settlement matters, the Smith Defendants, motivated at least in part by the immense financial pressure caused by their default on ████████ ████ of dollars in litigation funding debt, placed their interests above the interests of the clients of the joint venture by surreptitiously engaging in parallel negotiations with Johnson & Johnson which seriously undermined the settlement position of the clients of the joint venture. Because of the ██████ debt of the Smith Defendants, and ██████████████████████████████████████████ ██████, the Smith Defendants were desperate for a settlement as soon as possible. Without an immediate settlement, the Smith Defendants were at risk of getting so far in debt that their share of fees from a settlement would all go to pay off their debt, leaving them with nothing or possibly still in debt. These secret negotiations were thus conducted by the Smith Defendants in an effort to obtain a settlement that would alleviate their ██████ financial distress but which would not, in Beasley Allen's opinion, be in the best interest of the jointly represented clients.

48.    The secret negotiations by the Smith Defendants resulted in Johnson & Johnson's failure to engage in good faith settlement negotiations with Beasley Allen and to instead pursue a settlement on terms favorable to itself by taking advantage of the Smith Defendants' financial distress.   Johnson & Johnson ultimately presented to the Smith Defendants a proposed Memorandum of Understanding that, while making improvements to the original third bankruptcy-related resolution plan, included illusory terms and still did not provide fair, timely, and certain compensation for the jointly represented clients.

49.    The Smith Defendants sent the proposed Memorandum of Understanding (the "Proposed MOU") to Beasley Allen describing it as a formal offer of settlement, insisting that it be communicated to the clients, and expressing their full support for the Proposed MOU.   Most of the financial terms contained within the Proposed MOU had previously been offered by Johnson & Johnson and rejected by Beasley Allen partner Andy Birchfield.

50.    On August 26, 2024, Beasley Allen sent a letter to the jointly represented clients which attached a copy of the Proposed MOU and highlighted some of the unacceptable terms it contained.   This letter also indicated that one of Beasley Allen's co-counsel supported the proposal and recommended that clients accept it.

51.    The Proposed MOU still did not provide adequate compensation and

there was no way of knowing how much a client would be paid or when they would be paid.

52.    Thereafter, the Smith Defendants continued surreptitious negotiations with Johnson & Johnson.

53.    Around August 30, a Memorandum of Understanding was executed between Johnson & Johnson and the Smith Law Firm (the "Smith MOU").  The effective date of the Smith MOU was August 30, 2024.  At the time that Smith Law executed the Smith MOU, it remained in default of ███████████████████ in litigation funding debt with interest continuing to accrue.

54.    Importantly, the Smith MOU contained certain conditions precedent to Johnson & Johnson's obligations to do anything, one of which required the Smith Law Firm, on or before September 16, 2024, to request that the solicitation agent for the bankruptcy plan **change the votes** of the Talc clients the Smith Law Firm represented such that at least 95% of the Smith Law Firm's clients would now vote in favor of the Johnson & Johnson bankruptcy plan.  These clients included the 11,503 jointly represented clients as well as the talc clients the Smith Defendants had attempted to conceal from Beasley Allen.

55.    Under the Smith MOU, Johnson & Johnson agreed that it would cease its pursuit of discovery regarding the Smith Defendants' litigation funding.

56.    In connection with their agreement to now change the votes of the

jointly represented clients who opposed the bankruptcy plan, the Smith Defendants demanded that Beasley Allen provide them with the contact information (information that had been provided to the Smith Defendants over the years by Beasley Allen) for all the jointly represented clients so that they could send the clients a letter urging each of the clients to change their vote and now vote in favor of Johnson & Johnson's updated third bankruptcy plan. Based on the agreement with the Smith Defendants that Beasley Allen would handle all global settlement negotiations and be responsible for all client contact, Beasley Allen declined to provide the contact information.  The Smith Defendants nevertheless sent to clients of the joint venture a letter urging them to change their vote to now support the updated bankruptcy plan.  Beasley Allen believes, and on information and belief alleges, that the Smith Defendants' motivation for doing so was at least in part their desire to alleviate their significant financial distress and realize income from the settlement.

57.    On September 11, 2024, Allen Smith and the Smith Law Firm sent a letter by email and FedEx to the jointly represented clients promoting the terms of the Smith MOU (though not including a copy of the actual agreement) and urging all clients to vote to approve the new bankruptcy plan.  This letter was the first time the Smith Defendants had ever sent a communication to all the joint venture clients.  The letter provided a link for voting and asked that the clients vote in **two days**, by

September 13.[2]  "If you choose not to vote, I will submit your vote for approval of the new Plan in my power as attorney authorized to prosecute your case."  The letter failed to disclose to clients the fact that Smith Law was currently in default on ████████████████████ in litigation funding debt which objectively would cause a reasonable person to question their settlement recommendation and further failed to disclose to clients that Johnson & Johnson agreed in the Smith MOU to not further pursue discovery into the litigation funding debt of the Smith Defendants.

58.    On September 16, 2024, the Smith Defendants submitted a Master Ballot on behalf of at least 95% of the clients they represented that purported to change the votes of most of the joint venture clients who previously rejected the plan to now support it.  The Smith Defendants' Master Ballot primarily relied on power of attorney to vote on behalf of the clients of the joint venture, a power the Bankruptcy Court later held the Smith Defendants did not have.

59.    The solicitation agent for the bankruptcy, which had been selected and paid for by Johnson & Johnson, accepted the Smith Defendants' Master Ballot as superseding the Master Ballot previously submitted by Beasley Allen.  After the solicitation agent switched the votes of the joint venture clients from rejecting the plan on Beasley Allen's Master Ballot to now accepting the plan under the Smith Defendants' Master Ballot, the acceptance rate on the plan went from 71% to 83%.

---

[2] Smith and Smith Law later extended the voting deadline two more days.

With Beasley Allen's Master Ballot superseded, the solicitation agent certified that the bankruptcy plan had achieved the 75% approval threshold for filing. Johnson & Johnson's subsidiary, Red River Talc, filed for bankruptcy the following day (the "Red River Bankruptcy").

60.    The Bankruptcy Court specifically found that "[w]ithout the Smith Master Ballot overcoming the Beasley Allen Master Ballot, Red River would not have the requisite 75% claimant support for the Initial Plan." In other words, but for the Smith Defendants submitting a Master Ballot on behalf of the joint venture clients which changed most of their votes, the Red River Bankruptcy could not have been filed.

61.    Because the proposed resolution of talc claims through the bankruptcy plan – as amended by the Smith MOU - was not in the best interest of the joint venture clients, Beasley Allen was forced to spend millions of dollars and countless hours fighting the Red River Bankruptcy.

62.    After months of contentious, expensive, and time-consuming litigation, the Bankruptcy Court dismissed the Red River Bankruptcy, returning all the talc claims to the tort system for resolution.

63.    The Bankruptcy Court ultimately held that all votes on the Master Ballot submitted by Beasley Allen which were not supported by an affirmative response from the client were not valid based on the certification language contained

in the ballot.  The Bankruptcy Court also held that all votes on the Master Ballot submitted by the Smith Defendants which were cast based on power of attorney were invalid as they had no valid power of attorney which would allow them to vote on behalf of the claimants.

64.    Therefore, while the efforts of the Smith Defendants to settle the claims of the joint venture clients in bankruptcy ultimately were unsuccessful, their ███████ debt remains and continues to grow daily, rendering them unable to represent the joint venture clients in a disinterested professional way, represent the best interests of the joint venture clients, and fulfill their obligations under the JV Agreement.

65.    The corporate veil of Smith Law is due to be pierced so as to impose personal liability on Allen Smith, its sole member and manager, because Smith Law is inadequately capitalized to fulfill its obligations under the JV Agreement and Allen Smith committed fraud by failing to disclose to Beasley Allen the ███████ amount of litigation funding debt it had incurred and defaulted on.  The corporate veil is also due to be pierced as Smith Law is operated as a mere instrumentality or alter ego of Allen Smith.  Allen Smith has complete control over Smith Law and misused that control by using Smith Law to take out ███████ amounts of litigation funding debt that was then mis-used for purposes which did not benefit Smith Law. The result is that Smith Law now is in default on ███████ in litigation

funding debt rendering it incapable of performing under the JV Agreement and costing Beasley Allen the benefit of its bargain and the other damages outlined herein.

## Count One – Breach of Contract

66.    Beasley Allen incorporates by reference the allegations contained in paragraphs 14-29, 31-35, 46-48, 52-54, 56-61, and 65.

67.    The January 23, 2014, JV Agreement is/was a binding and valid contract between Beasley Allen, Smith Law, and Porter Malouf.

68.    Beasley Allen has performed its obligations under the JV Agreement.

69.    Defendants have breached the JV Agreement by, among other things:

(a)    Failing to fulfill their obligation to pay 50% of the expenses of the Talcum Powder Litigation such that Beasley Allen is currently owed at least $735,584.67;

(b)    Failing to perform 50% of the work on the Talcum Powder Litigation;

(c)    Failing to transfer all existing and future talcum powder clients to Beasley Allen for signing and handling under the JV Agreement – initial intake, obtaining necessary authorizations, information, pathology, and medical records to appropriately screen each case;

19

(d)     Upon information and belief, breaching and/or anticipatorily breaching their obligation to share fees received from talcum powder cases with Beasley Allen;

(e)     Contrary to their course of performance, interfering in, disrupting, and undermining global settlement discussions with Johnson & Johnson which the parties had agreed would be conducted by Beasley Allen;

(f)     Purporting to change the votes of jointly represented clients to support the third bankruptcy plan without proper authority or consent from the clients; and

(g)     Failing to work together with Beasley Allen in the prosecution of the Talcum Powder Litigation and instead working separately from Beasley Allen in a clandestine effort to settle the litigation without the knowledge or agreement of Beasley Allen on terms that would provide relief from the Smith Defendants' ███████ and defaulted litigation funding debt, and prevent discovery of that debt by Johnson & Johnson, but that were not ultimately in the best interests of the clients of the joint venture.

70.     The Smith Defendants further breached the JV Agreement by incurring such ████████ litigation funding debt, ████████████████████████████

███████████████████████, that they became incapable of sharing the talc litigation expenses and became financially compromised to the extent of being unable to represent the joint venture clients in a disinterested professional way and, in fact, became desperate and motivated to settle the claims of the joint venture clients based on their own personal interests rather than what was in the best interest of the joint venture clients.

71.    The Smith Defendants inability to place the best interests of the joint venture clients above their own has also breached the joint venture agreement by making it impossible for the parties to work together in the representation of the joint venture clients, e.g., by subjecting Beasley Allen to disruption, chaos, and confusion in the conduct of the litigation, including creating the potential that the interests of the Smith Defendants in the joint venture would be sold or auctioned off resulting in the transfer of representation to lawyers of whom Beasley Allen nor the clients of the joint venture approve.

72.    Because the JV Agreement required the parties to work together in jointly representing the talc claimants, Beasley Allen had a reasonable expectation, consistent with the implied duty of good faith and fair dealing owed to it by the Smith Defendants, that the Smith Defendants would not engage in secret settlement negotiations undermining the negotiations being handled by Beasley Allen, with the result being a proposed settlement that favored the financial interests of the Smith

Defendants over the best interests of the joint venture clients.

73.    The Smith Defendants further breached the JV Agreement and violated the duty of good faith and fair dealing by entering the Smith MOU with Johnson & Johnson in which they included a provision, the effect of which was to gain Johnson & Johnson's assistance in hiding the ███████ and default status of their litigation funding debt from the clients of the joint venture and from Beasley Allen, and by agreeing to change the votes of the clients of the joint venture to vote in favor of a settlement that was not in the clients' best interest, including persuading gynecological cancer clients to release for only $1,500 claims that might arise in the future related to ovarian cancer.

74.    Therefore, not only have the Smith Defendants breached the JV Agreement in the past by failing to perform fifty percent of the work, by failing to pay fifty percent of the expenses, and by committing the other breaches set out in paragraphs 69-73, but also, they have breached the JV Agreement by rendering themselves – because of their existing default on over ███████ in litigation funding debt - presently and in the future incapable of performing work for the joint venture clients and representing the joint venture clients in a disinterested professional way. This ██████ default also renders the Smith Defendants incapable of sharing the talc litigation expenses going forward.

75.    As a proximate consequence of Defendants' breach of contract,

Plaintiff has been injured and damaged in that it has lost the benefit of its bargain and is prevented from receiving in the future the benefit of its bargain; it has not been fully reimbursed for litigation expenses it advanced on behalf of Defendants and will have to pay 100% of the talc litigation expenses going forward; it has incurred the entirely unreimbursed expense of providing disproportionate amounts of work on the Talcum Powder Litigation and will now have to perform all the work in the future; it spent countless hours of work attempting to negotiate a fair and reasonable settlement with Johnson & Johnson which never had a chance of success because of the Smith Defendants' undermining of those negotiations; it has not received its contractual interest in all of the Smith Defendants' talcum powder cases; it has lost profits; it spent unnecessary time and millions of dollars for the benefit of the jointly represented clients to defeat the Red River Bankruptcy that was filed only because of the actions of the Smith Defendants in conducting undisclosed and improper negotiations contrary to the best interest of the clients of the joint venture and in purporting to change the votes of the joint venture clients; and it has otherwise been injured and damaged.

WHEREFORE, Beasley Allen seeks an award of compensatory damages in excess of $75,000, interest, costs, and such other relief to which a jury may find it entitled.

## Count Two –Fraudulent Suppression

76.    Beasley Allen incorporates by reference the allegations of paragraphs 12, 14, 16-23, 25-29, 31-36, 38-39, 46-48, 52-54, 56-61, 65, 83-84.

77.    As a result of their obligations under the JV Agreement; of the misrepresentations and/or misleading statements they made relative to Beasley Allen being solely responsible for global settlement negotiations; of the representations they made in, and in connection with negotiating, the JV Agreement and thereafter; of their fiduciary and/or confidential relationship with Beasley Allen; of their duty of loyalty and care owed to the Joint Venture and their joint venturers; of their superior knowledge; and of special circumstances related to this case, Defendants had an ongoing duty to disclose certain material facts to Beasley Allen.

78.    Among those material facts was that the Smith Defendants did not have, or no longer had, the financial and other resources necessary to comply with the JV Agreement, including to provide generally fifty percent of the work and fifty percent of the litigation expenses, over what was contemplated to be an extended period of time; that the Smith Defendants were either unwilling or unable to make their obligations under the JV Agreement the focus of their practice to the exclusion of unrelated litigation; that the Smith Defendants did not interpret or regard the JV Agreement as requiring that they and Porter Malouf work even approximately 50% of the total hours performed by the parties to the JV Agreement and that the Smith

24

Defendants had no intention to be obligated to perform, or to perform, even approximately 50% of the total hours performed by the parties to the JV Agreement with or without the involvement of Porter Malouf; that the Smith Defendants had taken, outside of the JV Agreement, talcum powder cases and represented talcum powder clients in which and in whom Beasley Allen had, or should have had, a contractual interest; that the Smith Defendants had bought out the interest of Defendant Porter Malouf, and had done so by increasing their debt to a litigation funding entity, thus reducing Beasley Allen's chances that its joint venturers would or could comply with the JV Agreement; that upon information and belief, the Smith Defendants were paid a fee to try a Talc case which they kept for themselves and did not share with the other members of the joint venture as required by the JV Agreement; that the Smith Defendants were engaged in parallel global negotiations with Johnson & Johnson; that the Smith Defendants were negotiating with Johnson & Johnson in a manner which served to undermine the negotiating leverage of the jointly represented clients and furthered the personal interest of the Smith Defendants in seeking a settlement to relieve their financial distress; that the Smith Defendants had fallen into such ████████ debt in connection with the Talcum Powder Litigation upon which they had defaulted that they were rapidly approaching the point where they could not pay off the debt so that for their own personal interest they needed a quick settlement; that their independent judgment about the Talcum

Powder Litigation and the potential settlement of that litigation was objectively subject to question; and that the significant litigation funding default prevented them from sharing the talc litigation expenses and representing the joint venture clients in a disinterested professional way, and motivated them to elevate their interests over the best interests of the joint venture clients.

79.    Rather than disclosing said material facts and such other material facts as may be uncovered through discovery, Defendants suppressed them with the intent to deceive Beasley Allen.

80.    Without knowledge of the material facts suppressed by Defendants, Beasley Allen entered the JV Agreement with Defendants on the specific terms set out in the JV Agreement; continued working with Defendants after the time the Smith Defendants became fully aware that they could not meet their financial obligations in connection with the Talcum Powder Litigation and could not continue pursuing the litigation in the best interests of the clients; continued paying litigation expenses and contributing disproportionate amounts of work for the benefit of the Smith Defendants and the joint venture; continued including the Smith Defendants in all talcum powder cases received by Beasley Allen; forbore from informing the joint venture clients of the Smith Defendants' actions and seeking a termination of the joint venture; and, because it did not know about all of these material facts, forbore from pursuing its other legal remedies.

81. As a proximate consequence of said suppressions, Beasley Allen was injured as set out in Count I of this Second Amended Complaint, and in that it agreed in the JV Agreement to divide certain proceeds of the Talcum Powder Litigation equally with the Smith Defendants to the full amount of which share of proceeds said Defendants are not entitled. Beasley Allen also has been caused to incur greater internal costs and expenses to perform work in said litigation that should have been borne by the Smith Defendants; it has been caused to pay without reimbursement certain of Defendants' share of Talcum Powder Litigation expenses; it has been caused to provide disproportional amounts of work on the Talcum Powder Litigation without compensation from Defendants for the performance of work Defendants should have performed; it has been caused to receive less compensation or to have an expectancy of less compensation on cases that have been, or will be, successfully litigated and that were sent to other lawyers by the Smith Defendants in an attempt to hide them from Beasley Allen; it has been caused to spend time and money resisting efforts by the Smith Defendants to promote and enter a settlement that is not in the best interest of its clients; it has been caused to spend excess time and money in connection with settlement negotiations in the Talcum Powder Litigation that had been undermined by the Smith Defendants; and it has been caused to spend time and money in connection with challenging the unauthorized change of client votes and opposing Johnson & Johnson's latest bankruptcy. Beasley Allen has been

27

otherwise injured and damaged.

WHEREFORE, Beasley Allen seeks an award of compensatory damages in excess of $75,000, and punitive damages, interest, costs, and such other relief to which a jury may find it is entitled.

### Count Three – Breach of Fiduciary Duty

82.    Beasley Allen incorporates by reference the allegations of paragraphs 12, 14, 16-23, 25-29, 31-36, 38-39, 46-49, 51-62, 64-65, and 78.

83.    Through the relationship of the Parties created by the JV Agreement, including their relationship acting as co-counsel in the pursuit of legal claims on behalf of talc claimants, a fiduciary relationship was created among the Parties.

84.    The Defendants' fiduciary duty to Beasley Allen required that they act for the benefit of their co-venturer as to matters within the scope of the joint venture and make a complete disclosure to Beasley Allen of all matters affecting the joint venture.

85.    By engaging in the conduct described in this Second Amended Complaint, including the conduct described below, Smith and the Smith Law Firm have breached their fiduciary duties owed to Beasley Allen:

a.    By actively, and surreptitiously, undercutting Beasley Allen in settlement negotiations with Johnson & Johnson in an effort to get a settlement that would alleviate their significant financial distress, but which would not, in Beasley

Allen's opinion, be in the best interest of the jointly represented clients.

b.    By entering into the Smith MOU without the knowledge or agreement of Beasley Allen.

c.    By causing Johnson & Johnson to agree to a provision in the Smith MOU that was for the personal benefit of the Smith Defendants and that enlisted Johnson & Johnson in the Smith Defendants' efforts to hide their defaulted debt from their clients;

d.    By recommending that clients of the joint venture change their vote so as to support the bankruptcy plan as revised by the Smith MOU without disclosing to clients or to Beasley Allen that the Smith Defendants were in default on over ████████ of litigation funding debt and without disclosing to the clients that the Smith MOU prevented Johnson & Johnson from further seeking discovery on the Smith Defendants' litigation funding debt;

e.    By changing the votes of thousands of clients of the joint venture to support the revised bankruptcy plan under a power of attorney that the Smith Defendants did not have;

f.    By hiding talc claimants from Beasley Allen by sending them to other lawyers for signing and handling; and

g.    By failing to disclose and hide material facts as set out in Count II of this Second Amended Complaint.

86.    As a direct and proximate result of the breach of fiduciary duties by Smith and the Smith Law Firm, Beasley Allen has been injured and damaged as alleged in paragraph 81, above.

WHEREFORE, Beasley Allen seeks an award of compensatory damages in excess of $75,000, and punitive damages, interest, costs, and such other relief to which a jury may find it is entitled.

### Count Four – Declaratory Judgment

87.    Beasley Allen incorporates by reference the allegations of paragraphs 8 through 86.

88.    Plaintiffs bring this action pursuant to Rule 57, Alabama Rules of Civil Procedure, Code of Alabama § 6-6-220, et seq., and the Federal Declaratory Judgement Act, 28 U.S.C. § 2201, et seq.

89.    An actual justiciable case and controversy has arisen among the parties including, but not limited to:

a.    Under the JV Agreement, when it provides "Generally, Beasley Allen will be responsible for fifty percent (50%) of the work and you will be responsible for fifty percent (50%)" whether the words "fifty percent of the work" means fifty percent of the hours worked.

b.    If the words "fifty percent of the work" as used in the JV Agreement do not mean fifty percent of the hours worked, whether the JV

Agreement is void and unenforceable as to the division of work and the division of fees between the lawyers because it is either too indefinite and uncertain to be enforced or it represents, as to the division of work and the resulting division of fees based on work, an unenforceable agreement to agree in the future. If the Court declares the JV Agreement to be unenforceable as to the division of work and the division of fees, whether all parties to the JV Agreement are entitled to a division of any fees recovered from the claims of the joint venture clients based on *quantum meruit*.

   c. Whether the Smith Defendants are incapable, as a matter of fact and law, of continuing as parties to the JV Agreement and otherwise of representing the joint venture clients presently or in the future. Examples of the actions, inactions, and circumstances that are relevant to this case and controversy include the Smith Defendants: incurring and then failing to disclose to Beasley Allen and the joint venture clients the ███ amount of litigation funding debt that the Smith Defendants owed and in connection with which they were at relevant times, and currently are, in default with the result being that the Smith Defendants are prevented from representing the joint venture clients in a disinterested professional way and are unable to meet their financial obligations under the JV Agreement to share talc related expenses as evidenced by the fact that they have failed to fully pay the last three quarterly expense reconciliations

31

provided to them; are incapable of placing the interests of the joint venture clients above their personal interests; and have reached or will reach a level of indebtedness that has eliminated or will eliminate, any anticipated compensation-related incentive the Smith Defendants might otherwise have had to adequately represent the joint venture clients.

        d.    Whether the actions of the Smith Defendants in hiding talc clients from Beasley Allen despite their contractual duty to transfer all existing and future talc clients to Beasley Allen for intake, signing up, and otherwise handling; in engaging in surreptitious settlement negotiations with Johnson & Johnson, despite agreeing to work with Beasley Allen and agreeing that Beasley Allen would handle all global settlement negotiations, with the result being that the negotiating position of the clients of the joint venture was severely undermined; in agreeing to change, and later changing, the votes of thousands of joint venture clients to accept the revised bankruptcy plan under a power of attorney that the Smith Defendants did not have, which allowed the Red River Bankruptcy to be filed and forced Beasley Allen to spend an enormous amount of work and millions of dollars on behalf of the joint venture successfully defeating the bankruptcy; in failing and refusing to pay their agreed upon portion of the expenses of the joint venture; in failing to disclose to Beasley Allen and the joint venture clients the ███████ amount of litigation finance debt

that the Smith Defendants owed and in connection with which they were at relevant times, and currently are, in default with the result being that the Smith Defendants are prevented from representing the joint venture clients in a disinterested professional way, are incapable of placing the interests of the joint venture clients above their own personal interests, and are financially incapable of bearing the expenses necessary to adequately prosecute the claims of the joint venture clients; and other wrongdoing previously alleged in this Second Amended Complaint, demonstrate that there is such serious discord and dissension among the joint venturers that it is not reasonably practicable to carry on the business of the joint venture.

e.      Whether the joint venture is due to be dissolved when the essence of the JV Agreement was that the parties would work together to share clients, share work, share expenses, and ultimately share fees, and the wrongful and deceptive conduct of the Smith Defendants in circumventing the terms of the JV Agreement went to its very core, making its objectives impossible to realize, thus evidencing an intent by the Smith Defendants to abandon and terminate the JV Agreement.  The wrongful and deceptive conduct of the Smith Defendants is detailed in this Second Amended Complaint but includes their concealment from Beasley Allen of their buy-out of Porter & Malouf from the JV Agreement – thus leaving Beasley Allen with one less firm to assist in working on this

33

enormous litigation; their concealment of talc clients that were to be shared with Beasley Allen; their failure to perform anything remotely approaching half of the work on the Talcum Powder Litigation; their failure to pay their share of the talc related litigation expenses; their secret settlement negotiations with Johnson & Johnson; and their unilateral changing of votes of joint venture clients to support the latest bankruptcy plan when the terms of that plan were not in the clients best interest but served their interest in obtaining funds to try and pay off their ███████ litigation funding debt.

       f.     Whether, despite their contractual obligation to work together, the disagreement and dissension between the coventurers is so severe that all confidence and cooperation between them has been destroyed and the behavior of the Smith Defendants has materially hindered the proper conduct of the joint venture.

       g.     Whether carrying on the joint venture is practicable in light of the fact that: the coventurers can no longer agree on the conduct of the venture; the severe disagreement between the parties has caused confusion among the clients of the joint venture; and the relationship between the coventurers has severely deteriorated.

90.     There is uncertainty and insecurity with respect to Plaintiff's rights, status, and legal relations.

91.    The parties need this Court to determine their respective rights and duties concerning these matters.

92.    Plaintiff therefore requests an order from the Court:

a.    declaring and determining that when the JV Agreement requires the Smith Defendants and Porter Malouf to generally perform fifty percent of the work, the words "fifty percent of the work" means fifty percent of the hours of work;

b.    in the alternative, declaring and determining that if the phrase "fifty percent of the hours of work" in the JV Agreement does not mean fifty percent of the hours of work, then the JV Agreement is void and unenforceable as to the division of work and the resulting division of fees because these core provisions of the JV Agreement are either too indefinite and uncertain to be enforced or they represent an unenforceable agreement to agree in the future, leaving the parties to divide any fees recovered on a *quantum meruit* basis;

c.    declaring and determining that the Smith Defendants, as a matter of fact and law, are incapable of continuing as parties to the JV Agreement and otherwise of representing the joint venture clients presently or in the future and thus are entitled to a recovery from any fees ultimately obtained from the claims of the joint venture clients only on a *quantum meruit* basis up to the point that they could no longer adequately represent the best interests of the clients of the joint venture;

d.    declaring and determining that the Smith Defendants' breaches

of the JV Agreement as alleged in paragraphs 69-74 above are such that the JV Agreement has been terminated as a result, the joint venture is due to be dissolved, rendering the 50/50 fee split unenforceable and instead entitling the parties to recover from the claims of the joint venture clients on a *quantum meruit* basis; and

e.    Such other, further, or different relief to which Beasley Allen may be entitled.

s/ Robert D. Segall
Robert D. Segall (ASB-7354-E68R)
J. David Martin (ASB-7387-A54J)
COPELAND, FRANCO, SCREWS & GILL, P.A.
Post Office Box 347
444 South Perry Street (36104)
Montgomery, Alabama 36101-0347
T: 334.834.1180  F:  334.834.3172
Email: segall@copelandfranco.com
Email: martin@copelandfranco.com
**Attorneys for Plaintiff Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.**

## JURY DEMAND

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES OF THIS CAUSE.

s/  Robert D. Segall
OF COUNSEL

## CERTIFICATE OF SERVICE

I hereby certify that on the __7th__ day of ___October___, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Joel D. Connally
STRENGTH & CONNALLY, LLC
7020 Fain Park Dr., Ste. 3
Montgomery, AL 36117
T:  334/387-2121
Email: jc@strengthconnally.com

Thomas G. Bufkin
Carroll Bufkin, PLLC
1076 Highland Colony Parkway
600 Concourse, Ste. 125
Ridgeland, Mississippi 39157
T: 601/982-5011
tgb@carrollbufkin.com

*Counsel for The Smith Law Firm, PLLC and Robert Allen Smith, Jr.*

Bruce F. Rogers
Elizabeth N. Terenzi
BAINBRIDGE MIMS ROGERS & SMITH, LLP
600 Luckie Dr., Ste. 415
Birmingham, AL 35223
T:  205/879-1100   F:  205/879-4300
Email:  brogers@bainbridgemims.com
Email: bterenzi@bainbridgemims.com

*Counsel for Porter Malouf, P.A.*

_ s/ Robert D. Segall _____
Of Counsel

37